LAURA V. ATKINSON ET AL. *v.* RICHARD N. McCULLOH ET AL.

FRANCES A. BROWN *v.* RICHARD N. McCULLOH ET AL.

*Mental Incompetency—Of Party To Contract—Effect—Bona Fide Purchaser.*

Evidence as to one's mental condition, at the time of his signing a deed and contract, shortly before his death, *held* to show that he was incompetent.  p. 671

One to whom property was conveyed subject to a contemporaneous written agreement by him to turn over to the grantors the net proceeds of any sale by him of the property, less amounts advanced by him to the grantors and all expenses, *held* to hold the property as mortgagee.  p. 671

The contract of a person who has not been adjudicated *non compos mentis* is not void but voidable, and it is not even voidable at the arbitrary discretion of the incompetent person, but only when the other party knew of the disability, or there was some element of bad faith or unfairness.  p. 672

The mere fact that one dealt with a person whom he knew or should have known to be incapable of making a valid deed or contract vitiated the contract to such an extent that it could be avoided at the instance of the incompetent person and, in the event of his death, by his personal representatives or heirs.  p. 673

The contract of a lunatic, made with a sane person who had, or could by the exercise of reasonable prudence have had, knowledge of his disability, may be avoided at the option of the lunatic when of sound mind, or by his guardian, heirs, or devisees, whether the property is in the hands of the assignee or a remote grantee, provided they exercise that option within a reasonable time, and surrender whatever benefit they have received from the transaction.  p. 674

A grantor's heirs, who failed for more than three years after the grantor's death to assert the invalidity of the deed, as having been executed when the grantor was *non compos mentis*, or to have recorded an agreement in their possession, the effect of which was to make the deed a mortgage merely, and during that period recognized the grantee as the holder of the legal title, *held* estopped by their laches to question the grantee's title as against an innocent purchaser from him for value.

p. 676

The general rule that a purchaser who receives notice of a prior equity before taking the legal title, though after he has paid the whole or a part of the price, is not to be treated as an innocent purchaser for value, is not applicable in favor of adverse claimants who, though knowing of the purchase, permit the purchaser to make expensive improvements on the property before notifying him of their claim, they being in such case estopped to deny his status as an innocent purchaser for value.

pp. 676, 677

Appellee was not charged with notice of an adverse claim by the heirs of his vendor's grantor, based on the mortgage character of the conveyance to the vendor, absolute in terms, merely by reason of the fact that, at the time of such conveyance, the grantor was indebted to the grantee therein, appellee's vendor.

p. 677

*Decided January 21st, 1926.*

Appeals from the Circuit Court of Baltimore City (STEIN, J.).

Bill by Laura V. Atkinson, Frances A. Brown, and others, against Richard N. McCulloh and others. From a decree for defendants, Laura V. Atkinson and others of the plaintiffs appeal. Frances A. Brown appealing separately from the others. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*William D. Macmillan* and *L. B. Keene Claggett,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellants.

*R. Legare Webb,* for Richard N. McCulloh and Pearl L. McCulloh, appellees.

*Edward L. Ward,* with whom was *Stephen W. Leitch* on the brief, for William H. Callahan, Jr., appellee.

OFFUTT, J., delivered the opinion of the Court.

James H. Atkinson, late of Baltimore City, for many years owned and operated the "Atkinson Quarry Property," located on Hampden Avenue and 28th Street in that city, where he engaged in the business of stone quarrying. In the later years of his life he fell into financial difficulties and from time to time placed three mortgages on the property, one to Louis D. George for $4,000, one to the Commonwealth Bank for $3,600, and one to Richard N. McCulloh, with whom he had intimate personal and business relations for many years, for $2,000. Notwithstanding these loans, his affairs appear to have gone from bad to worse, and in 1921 he was not only old and feeble, and helpless from disease and the disabilities incident to his age, but the taxes on his property, and the interest on the loans, had accumulated until they reached a sum which he was unable to pay from any funds in his possession. In that situation, application was made to McCulloh by or on behalf of Atkinson for a further loan to take care of these arrearages, and that application was by him referred to his attorney. In consequence of his advice as to the form of the transaction, McCulloh advanced $1,586, and Atkinson is alleged to have conveyed to him by a fee simple deed his quarry property. Immediately prior to the execution of that deed, an agreement was signed by James H. Atkinson and wife and McCulloh, and acknowledged by them, which contained this provision:

> "That in consideration of the advancement by the said party of the second part of sufficient money to pay off the taxes and mortgage interest due on said property in accordance with the attached list of debts due and owing by said parties of the first part, the

said parties of the first part do agree to execute and deliver unconditionally to the said party of the second part a good and sufficient deed in fee simple of the said property (being the property conveyed to him by deed dated December 22nd, 1890, and recorded among the Land records of Baltimore city in Liber J. B. No. 1323, folio 476 &c.) with full power and authority in the said party of the second part to sell and convey the said property when and at such price as he may deem advantageous. And the said party of the second part hereby agrees that he will turn over to the said parties of the first part the net proceeds of any sale he may make of said property, less all expenses of any sale, the principal and interest of all mortgages on said property, and also less the amount advanced in accordance herewith, as shown by the attached list hereinbefore referred to, as well as any other or further sums advanced by said party of the second part to the said parties of the first part by him on their account to the date of such payment of proceeds, also all taxes and other charges on said property."

These instruments were dated January 20th, 1920, and on February 11th, 1921, James H. Atkinson died. On May 28th, 1924, Richard N. McCulloh and Pearl L. McCulloh, his wife, entered into an agreement with William H. Callahan, Jr., to sell him the "Atkinson Quarry Property" for $16,000, and on August 1st, 1924, before the property had been granted to Callahan, Laura V. Atkinson, widow of James H. Atkinson, Frances A. Brown, Rosa M. Barnes, Ida D. Pyle and Laura V. Barnes, his surviving children, filed in the Circuit Court of Baltimore City their bill of complaint against Mr. and Mrs. McCulloh and Callahan, alleging, in substance, that the deed and agreement from the Atkinsons to McCulloh were executed at a time when James H. Atkinson was mentally incapable of executing a valid deed or contract, and that the signature of Laura V. Atkinson thereto had been procured by artifice and undue influence; that the property was held as trustee by McCulloh; that they

had vainly sought an accounting from him of the disbursements made by him for the account of the Atkinsons, and of the monies collected by him as income from said property; and that the sale was not fairly made and was for a wholly inadequate price; and praying the court to annul the deed and agreement of January 20th, 1920, as well as the contract of sale with Callahan, and to require McCulloh to account.

The defendants answered that bill severally. Callahan disclaimed any knowledge of the relations between McCulloh and the Atkinsons, alleged that he was an innocent purchaser for value, and that he had placed valuable improvements on the property. Mrs. McCulloh disclaimed any knowledge of the matters alleged in the bill, while McCulloh in his answer alleged that the deed and agreement of January 20th, 1921, were executed in good faith, when the parties thereto were fully capable of executing a valid deed or contract, that it was not procured by undue influence or artifice, that he had sold the property in good faith for the highest obtainable price after diligent efforts to sell it at a higher price, that he did not hold the property as trustee, and that the agreement of January 20th "was merely an expression in writing by your respondent of the thought which he always had in mind in connection with this transaction, and that this was never a condition made by the said James H. Atkinson or any of the complainants in this cause." Further answering, he asserted that "he was under no obligation to furnish a statement by way of accounting until a sale of the property was made and the proceeds received by him, at which time he promised to the said complainants and their solicitors, as full and complete statements, so far as he was able to give it, of all the details of said transaction." He admitted that he did not inform Mrs. Atkinson or any of the complainants that he was about to sell the property and that he did not consult them about the sale, because, he said, he did not think it was "necessary."

Evidence was taken in connection with the issues pre-

sented by these pleadings, and at its conclusion the court ratified the sale to Callahan, appointed R. Legare Webb trustee to convey the property and receive the purchase money, directed him to pay therefrom the George mortgage and all public dues, taxes and charges, and all judgment liens against the property, and to bring the balance into court for distribution, and directed McCulloh to account for all disbursements and collections made in connection with said property by him. From that decree the complainants appealed.

The issues presented by the appeal are these: (1) Whether James H. Atkinson was, at the time he signed the deed and agreement of January 20th, 1921, capable of executing a valid deed or contract; (2) whether Laura V. Atkinson was at that time mentally capable of executing a valid deed or contract, and whether her signature was procured by undue influence or fraud; (3) whether Richard N. McCulloh as a result of the execution of these instruments held the property as a mortgagee; (4) whether the deed and the agreement of January 20th, 1921, constituted a contract fair to the grantors; (5) whether Callahan, the purchaser, can be charged with notice of any infirmity in the deed to McCulloh; (6) whether the property was fairly sold for an adequate price: (7) whether the complainants have by their laches estopped themselves from attacking the deed and agreement of January, 1921, and, (8) assuming those instruments to have been valid, can the purchaser be affected by any dereliction of duty on the part of McCulloh in selling the property?

The first, second, third and sixth of those issues may be briefly disposed of. The record contains no evidence which is sufficient to warrant the inference that when the deed and contract of 1920 were made Mrs. Atkinson was not mentally competent, or that she did not understand the contents thereof, or that she was induced to execute them by fraud, undue influence, artifice, or deception. It is equally clear from the record that at that time James H. Atkinson was not

capable of executing a valid deed or contract. Dr. Vernon F. Kelly, who was his attending physician, in describing his condition during the last thirty days of his life, said: "The old man did not go to bed until he was so stupid and falling around it was impossible to keep him up, and from that time on he grew gradually worse, and more stupid, and some comatose—you would have to arouse him and wash his face to get any sense in him. I would listen to his heart and pinch his face, open his eyes, and he would stare, and possibly after two or three minutes I would get him so he would smile, and many times I know he smiled and did not recognize who I was. I don't know how long that went on, but I am sure, from the time he went to bed until he died, he was in such a condition he just could not be up any more. (The Court): Did that condition you describe last during the thirty days immediately preceding his death? (The Witness): At least thirty; from the time he went to bed, that was. I don't remember—I imagine he was in bed about two months. It was before Christmas. When did you say he died? Q. February 11th. A. It was before Christmas, I recall, he went to bed. I don't know how long."

Millard F. Barnes, his son-in-law, who was present when the papers were signed, gave the following description of his condition at that time: "When did you observe, how did he look? A. He was just like he was stupid and kind of semi-conscious, and we had to arouse him, and after we would arouse him then he would fall off and we just had to keep a move on him all the time to get him to look up, and it would be some time after he opened his eyes before you could bring him to any kind of sensibility at that time. * * * What, if anything, took place between Mr. Webb and the others there? What did Mr. Webb have or what did he say? A. Mr. Webb brought out a paper, some kind of an agreement, and this agreement he presented to all of them and he read it, and he asked Mr. Atkinson to sign it, sign this agreement, and when we tried to get him to sign it he

could not do it. We roused him up and he was limp, and as it went on I took the pen and signed it." Rosa M. Barnes, his daughter, when asked as to her father's physical condition when the papers were signed said: "On this particular day you say your father was very ill    A. Yes, my brother-in-law told me that Mr. Webb and Mr. McCulloh were coming out, and of course I could not rouse father, not even to give him breakfast, and then I took some cold water and bathed his face and managed to get his eyes open, and my brother-in-law and I carried him over to the Morris chair and he could hardly sit there. * * * You say you did, with the aid of your brother-in-law, Mr. Barnes, put your father in the Morris chair    A. Yes.   Q. What was his condition then?   A. Well, father did not know anything, but just simply sat there. He was limp. He could not use his hands or arms. We put his hands on the Morris chair. He could not even hold his hand up." And Mrs. Atkinson said that on that day "he was very bad off. He did not know anything at all, because I talked to him and he just looked at me like he was blind. He could not understand it was me."

The testimony of Armistead Webb and F. Legare Webb is relied upon by the appellees to overcome that evidence. Admistead Webb, the notary, said that mentally Mr. Atkinson was perfectly all right, "that he seemed to thoroughly understand all the business that was about to be transacted," but he later under cross-examination said: "I don't know just how sick he was, but he was sitting in this chair and the only way I could determine the amount of strength he had was by seeing him handle the pen. Even in taking the acknowledgment of people who have been perfectly well, they sort of lose their nerve when they do it and get shaky and say they cannot write. That was as far as I could see was his condition, and Mr. Barnes then volunteered to support his hand while the paper was being signed. Did he talk distinctly or indistinctly? * * * I had no conversation with him. * * * Did you hear what he said? * * * I don't remember now. * * * Did Mr. Atkinson make any comment?

\* \* \* I did not hear him say a word. \* \* \* Did you hear any conversation at all, then, between Mr. Atkinson and anybody else? \* \* \* No. \* \* \* Then the only thing you had to judge was the appearance of him, as you observed him sitting there? A. Yes, he was sitting in a Morris chair, as far as I can remember." F. Legare Webb, attorney for Mr. Mc-Culloh, in describing the transaction, said in part: "Mr. Atkinson was sitting in a chair, and he greeted me as usual. I had seen him at least twice. I said three times before. It may have been only twice prior to this actual execution of the deed, and each time he had greeted me and this time he did as usual. He spoke to me and I asked him how he was feeling, and he said, 'Not so good,' or 'Not so chipper,' or 'Not so much.' He did not look so much. He looked like he was pretty feeble and weak. \* \* \* I don't remember whether the agreement or the deed was signed first, but whatever paper was first put on Mr. Atkinson's lap, as he had, as I recall it, some kind of blanket or cover over his lap, and we got something stiff like a book or magazine or box top to rest the paper on. Mr. Atkinson got the pen and started to sign, but his hand shook so that he could not sign the paper, and he said, 'I cannot write very well,' or something to that effect, when Mr. Millard Barnes got up and said, 'Here, Dad,' or 'Here, Pop,' or as he said since it may have been 'Wait a minute, Boss, I will help you,' and then Mr. Barnes put his hand on Mr. Atkinson's wrist or arm, like this (indicating) and Mr. Atkinson was sitting like this, just like I am, and there was something raised on the paper and Mr. Atkinson wrote his name and he signed it, both papers, and Mrs. Atkinson was then handed the papers and she signed both papers. Mr. Webb, the notary, asked her if they acknowledged that deed to be their act and deed and the agreement to be their act, and they both replied that they did. \* \* \* I discussed the matter two or three times with Mr. Atkinson and saw no indication whatever that he did not know what he was doing. It would be folly for me to say he did not look sick, because he was sick, and he looked sick.

and looked weak and feeble, but it was not an intricate trans-
action and he apparently, to all intents and purposes, under-
stood exactly what he was doing."

From the testimony to which we have referred, which in
substance is all that is relevant to the question, it appears
that when the papers were signed Atkinson was practically
moribund, that he was comatose, aroused with difficulty, and
when aroused did not always recognize those about him,
that on that occasion he was too feeble to sign his name
unaided, and that when he did sign, his hand was guided
by another, that during the whole transaction he did noth-
ing and said nothing to indicate that he knew what he was
doing.    The testimony of Mr. Armistead Webb is negative,
.and that of Mr. F. Legare Webb the mere expression of an
opinion, while Dr. Kelly, a disinterested witness, Millard F.
Barnes, Mrs. Rosa M. Barnes and Mrs. Atkinson all agree
that when the papers were signed Atkinson was in a condi-
tion which made it highly improbable that he was physically
or mentally capable of comprehending what was taking place
about him.

Nor can there be any doubt that under the contempo-
raneous agreement McCulloh held the property conveyed
to him by the deed of January 20th, 1921, as a mortgagee.
In view of the conclusion which we have reached as to the
status of Callahan as an innocent purchaser for value
as indicated below, it becomes unnecessary to refer in detail
·to the evidence concerning the contention of the appellants
that the property sold for less than its value and that the
sale thereof was not fairly made.    Because, conceding the
truth of those contentions for the purposes of the opinion,
nevertheless, they could not avail the appellants, for the
reason that they have by their laches estopped themselves
from objecting to the sale on that account.

The next question in order is whether the contract with
Atkinson was fair and in good faith, and that is the most
difficult question presented by the appeal.    If it had been
made by and between competent persons, there is nothing

in the contract or in the circumstances surrounding its incep-
tion to indicate any fraudulent or unfair intention on the
part of McCulloh, nor indeed is it suggested by the appel-
lants that there was. Atkinson was heavily indebted, his
property was subject to the liens of three mortgages, interest
and taxes were in arrear, and he had, so far as the record
discloses, no means to prevent a forced sale of his property
under the mortgages or for the overdue taxes. McCulloh
was willing to advance whatever was necessary to pay the
mortgage, interest, and overdue taxes, but he wanted more
security than in his judgment would have been given by an
ordinary mortgage, which would have been a fourth mortgage
on the property. If for that loan he had in fact taken
from the mortgagor an absolute deed for his equity of re-
demption, it is not clear upon what ground the transaction
could have been impeached by the mortgagor, if at the time
the deed was made he was *sui juris*. Still less could he
have impeached it when the entire transaction did not amount
to a sale, but was a mortgage, the purpose of which was to
secure the repayment of money actually loaned by the grantee
named in the deed. But the question is affected by the fact
that when it was executed Atkinson was incapable of execut-
ing a valid deed or contract, and that McCulloh, through his
agent and attorney, F. Legare Webb, was charged with
notice of that fact.

In this state the contract of a person who has not been adju-
dicated *non compos mentis* is not void but voidable, and it
is not even voidable at the arbitrary discretion of the incom-
petent person, but only in cases where the other party knew
of the disability, or where there was some element of bad
faith or unfairness in the contract itself. That a contract
made with a person *non compos mentis* by one with knowl-
edge of his disability may be avoided at the option of the
lunatic without regard to its fairness seems reasonably clear,
although the proposition is not altogether free from doubt.
In 32 C. J. 735 it is stated that "if the sane party knew
of the other's insanity, or if the circumstances were such.

that as a reasonable and prudent person he should have known
of it, the contract may be avoided." And that conclusion
finds support in the cases of *Flach v. Gottschalk Co.,* 88 Md.
374, where Judge McSherry, speaking for this Court, said:
"As the·lunatic's contract at best is only voidable, it would
be unjust and inequitable to allow him to repudiate it if it
had been made fairly and in good faith when the other party
was ignorant of the disability, unless both parties upon a
rescission of it can be restored to the situation they originally
occupied." Professor Williston, in his work on *Contracts,*
p. 488, says: "It is occasionally said also that a contract
with an insane person is void if his condition is known to the
contracting party. But the word void in such cases must be
used as meaning void at the option of the insane person, or
his representative, that is, voidable. It is doubtless a fraud
to enter into a contract with an insane person knowing his
condition." And in *Molton v. Camroux,* 2 Exch. 501, Pol-
lock, C. B., said: "But the rule, as above laid down by
Littleton and Coke, has, no doubt, in modern times been re-
laxed, and unsoundness of mind (as also intoxication) would
now be a good defence to an action upon a contract, if it
could be shown that the defendant was not of capacity to
contract, and the plaintiff knew it." And while there is
nothing in the transaction in issue here which savors of actual
fraud, nevertheless the mere fact that McCulloh dealt with
a person whom he knew or should have known to be incapable
of making a valid deed or contract vitiated the contract to
this extent, that it could be avoided at the instance of the
incompetent person, and in the event of his death by his
personal representatives or heirs (32 C. 736), and, it has
been said, even against a purchaser in good faith and for
value (Williston, par. 252), although the authorities are in
sharp conflict on that question. In *Brewster v. Weston,* 235
Mass. 14, the Supreme Court of Massachusetts, after exam-
ining and citing the opposing decisions, said: "The absolute
and paramount right of infants and insane persons to avoid

their contracts may be exercised against an innocent purchaser for value from the grantee, otherwise the law will fail to afford that measure of protection to the mentally helpless and incompetent which their condition justly requires." The force of that decision is to some extent affected by·the consideration that in Massachusetts the rule is that the deed of an insane person is ineffectual to convey land unless ratified by· him when of sound mind or by his heirs, devisees, or legally appointed guardians, and is therefore different from the rule stated in *Flach v. Gottschalk Co., supra.* In *Odom v. Riddick,* 104 N. C. 515, 7 L. R. A. 118, the North Carolina Supreme Court, and in *Burch v. Nicholson,* 157 Iowa, 502, the Supreme Court of Iowa, reached from much the same premises a conclusion diametrically opposed to that of the Massachusetts court. But it seems to us the sounder view, and one more nearly in accord with the decisions of this Court, is that the contract of a lunatic made with a sane person, who had, or could by the exercise of reasonable prudence have had, knowledge of his disability, may be avoided at the option of the lunatic when of sound mind, or by his guardian, heirs or devisees, whether the property is in the hands of the assignee or a remote grantee, provided they exercise that option within a reasonable time, and surrender whatever benefit they have received from the transaction. For, on the one hand, if a conveyance of property were obtained from a lunatic by one who had full knowledge of his disability, and that fact could not be asserted against any grantee without notice of that infirmity, the law would in many, if not in most, instances, be helpless to protect the interests of those who have always been regarded as the particular objects of its care and protection. And what was said in *Flach v. Gottschalk Co.* concerning the contracts of lunatics was carefully limited to those cases in which the sane person dealing with the lunatics had no notice of his disability, and it had nothing to do with cases in which the grantee had such notice, but the person to whom he granted it had none.

On the other hand, it would be manifestly inequitable and unjust to permit the lunatic, in the event that he recovered his reason, or in the event of his death or continued lunacy, his heirs or representatives, to hold onto the benefits of the transaction, and at the same time repudiate it, and it would be equally inequitable to permit him or them to delay asserting its invalidity for so long a time that third persons dealing with the grantee would be justified through the mere lapse of time in concluding in good faith that his title was good.

And this brings us to the question as to whether the appellants have by their laches and negligence estopped themselves from impeaching the validity of the deed and contract of January 20th, 1921. In dealing with that question we will not consider what took place prior to the execution of these instruments, because while Mrs. Atkinson and Mrs. Rose May Barnes, who were present when they were executed, may be estopped by their conduct on that occasion, the other appellants would not be. But disregarding that, it is manifest that the conduct of all the appellants, after the death of Mr. Atkinson, does estop them now from questioning the validity of the deed to McCulloh. Mr. Atkinson died on February 11th, 1921. The deed to McCulloh was recorded on January 22nd, 1921. The agreement which would have put any purchaser upon notice of the true meaning and effect of the deed was never recorded, but a copy of it was in the possession of the appellants, from the time of its execution. The contract with Callahan was executed on May 28th, 1924. During that entire period of more than three years, not only did the appellants, who were charged with constructive notice of the deed, and who must have had actual knowledge of the contract, fail to take any steps to set the deed or the agreement aside, or to have the agreement recorded, but they by their conduct and their statements recognized McCulloh as the possessor of the legal title to the property, and not until he had actually contracted to sell it to Callahan did they ever question the validity of the deed

conveying it to him. They, therefore, knowing as they now say, that McCulloh never had a valid title to the property, nevertheless permitted him to remain in undisturbed and peaceful possession of all the *indicia* and muniments of title, and to occupy a position in which he might at any time sell it to an innocent purchaser for value. Under such circumstances, when he has actually done that which they must have known he could do, it is too late for them now to ask the court to declare his title invalid, when that would result in requiring an innocent purchaser to bear the burden of their laches. 2 C. J. 212, *et seq.*

The last question is whether, assuming the deed to Mc-Culloh to have been valid, can the rights acquired by the purchaser under his contract of sale with McCulloh be affected by any dereliction of duty on the part of McCulloh in making the sale? In connection with that issue it must be remembered that Callahan is not the holder of the legal title, although he has paid a part of the purchase price. And that, whether or not he knew, at the time he was negotiating with McCulloh for the purchase of the property, that Mc-Culloh held it not as absolute owner, but as a mortgagee, he was at least informed of that fact by the bill of complaint filed in this case. The general rule, supported by the weight of authority, is that a purchaser who receives notice of a prior equity before he has taken the legal title to the property, but after he has paid the purchase price or part thereof, is not to be treated as an innocent purchaser for value. *Paul v. McPherrin,* 48 Col. 522, 21 Ann. Cas. 460 and note, 27 R. C. L. 704.

But that rule, in the opinion of a majority of the Court, is inapplicable to the facts of this case. Because, notwithstanding the fact that Callahan took possession of the property immediately after its purchase and at once began to grade and improve it, the appellants permitted him to proceed with his improvements and to spend a large sum of money in the erection of a garage before they notified him that they had or claimed to have any rights in the property

whatever, although they knew as early as June 9th, 1924, that he had bought it. For, although their counsel wrote to Mr. Webb, counsel for McCulloh, no notice was given to Callahan until the bill in this case was filed on August 1st, 1924. Under such circumstances, in the opinion of the majority of the Court, the appellants are estopped from questioning the status of Callahan as an innocent purchaser for value. And since there is no evidence in the record that he had any notice, actual or constructive, prior to the purchase and the payment of part of the purchase money, and the improvement of the property by him, that McCulloh was not the absolute owner of the property, or that appellants claimed any rights therein, it becomes unnecessary to refer to the manner in which the property was sold or the adequacy of the purchase price, or whether McCulloh properly discharged the duties imposed upon him by the unrecorded collateral agreement of January 20, 1921. For we do not consider that such notice must be inferred from the single fact that Atkinson, at the time he conveyed the property to McCulloh, was indebted to him under prior mortgages.

It follows, therefore, that the decree appealed from will be affirmed.

*Decree affirmed, with costs.*