GERTRUDE LAW *v.* JOHN HANSON SAVINGS AND
LOAN, INC. ET AL.

[No. 1093, September Term, 1978.]

*Decided May 11, 1979.*

The cause was argued before MELVIN, WILNER and COUCH, JJ.

*Leroy Handwerger* for appellant.

*Carlton M. Green* and *Richard C. Daniels,* with whom were *Josef B. Brown* and *Reichelt, Nussbaum, Brown & Topf* on the brief, for appellee John Hanson Savings and Loan, Inc. *L. Dale Burgmeier,* with whom was *William A. Franch* on the brief, for other appellees.

WILNER, J., delivered the opinion of the Court.

Melissa J. Rowe is 89 years old. She formerly lived in Davidsonville, in Anne Arundel County, but she now is in a nursing home. She has six children — five daughters and a son.

In January, 1974, with Melissa's written consent, and with the express or tacit consent of her other children, Melissa's son Marvin petitioned the Circuit Court for Anne Arundel County to have Melissa declared a person under disability and to have himself appointed as guardian of her property. Melissa was alleged to suffer from "generalized arteriosclerosis with infirmity and cerebral arteriosclerosis with intermittent cerebral insufficiency", an allegation that was supported by the certificates of two physicians. Her disability was alleged to be a physical rather than a mental one; and, upon Melissa's consent, her nomination of Marvin as guardian, and the two physician's certificates, the court made the requested declaration and appointment. Most of Melissa's property at the time consisted of about 90 acres of land in Anne Arundel County having a value of some $150,000. That is what everyone seems to be fighting about.

In June, 1975, appellant, one of Melissa's daughters, filed a lengthy petition (which she amended in November, 1975)

seeking (1) removal of her brother as guardian, (2) an accounting, (3) rescission of certain deeds of trust and releases, (4) to have her brother, her nephew, the lawyers who represented Melissa and the guardian, and others made "parties defendant" in the proceeding, and (5) other relief. In this petition and amended petition appellant made a number of allegations of very serious wrongdoing which, *if true,* would not only warrant removal of the guardian, but would likely justify a variety of civil proceedings and possibly criminal action against a number of other people as well. She accused her nephew (Melissa's grandson) of converting Melissa's assets to his own use; she accused several lawyers of most serious conflicts of interest and both active and passive complicity in schemes to defraud Melissa and to misappropriate her assets; and she accused her brother of mismanagement, conflict of interest, and worse.

These petitions touched off a proceeding, or series of proceedings, that dragged on over a three-year period before four judges of the circuit court, and produced a record (excluding depositions and transcripts of hearings) exceeding 1,630 pages. The end of all this came on May 22, 1978, when the court dismissed appellant's petition against all defendants *with prejudice.* What is before us, of course, is the correctness of that action; and, to resolve that issue, we must consider who and what was before the circuit court.

Notwithstanding the assertion in her petition and amended petition that she was acting on behalf of her mother, her brother and sisters, and herself, appellant maintained throughout most of the proceeding that she was acting as a statutory "interested person" solely on behalf of Melissa and the guardianship estate, and not in her own interest. But in that limited capacity of "interested person", she filed exceptions to accounts and reports prepared by the court auditor, as well as extensive interrogatories, demurrers, motions for summary judgment, requests for subpoenas duces tecum, and a host and variety of other pleadings of one type or another. Through counsel, she participated in the taking of depositions and in at least three hearings in open court, all conducted at her request. When her nephew, one of

those persons named by her as a "party defendant" went into bankruptcy, she requested and received leave to file a claim in the bankruptcy on behalf of her mother and the guardianship estate. It is fair to say that the entire proceeding in the circuit court, from beginning to end, was occasioned by and was in response to the charges leveled by appellant.

In the course of these protracted proceedings, and in large part through the discovery efforts of appellant, a mass of documents was brought before the court. Some of these documents were merely placed routinely in the court file, as appendages to pleadings of one type or another; others were more directly brought to the court's attention, and even placed in evidence at one of the several hearings conducted along the way. In November, 1976, at a hearing on certain law motions then pending, including appellant's exceptions to the auditor's report, appellant had two groups of documents pertaining to the 1974 deed of trust sought to be annulled admitted into evidence in support of her exceptions.

In June, 1977, appellant filed with the court a 46-page "Statement of Facts" (supplemented by a 2-page "Supplemental Statement of Facts") to which was appended 143 pages of exhibits laying out in great detail all of the alleged wrongdoings on the part of the various people she caused to be named as defendants in the matter.

A month later, a hearing was held with respect to some of the staggering array of pleadings and motions then open. At that hearing, the court observed that the allegations set forth in appellant's pleadings were serious ones and would have to be answered. They sufficed, said the court, to shift the burden to the "defendants" to show that their actions had been proper ones; and that would require a hearing on the merits — *i.e.,* to determine whether appellant's charges were, in fact, valid. In connection with that hearing, the court also noted that appellant "would have to introduce formally at the hearing those matters that constitute the file. They would have to be introduced as exhibits." Counsel for appellant, apparently in recognition of this requirement, offered the originals of his various exhibits at this "preliminary" hearing, but was told, "Why don't we wait until the hearing on the

merits and then do that. We'll just clog up our files with them. . . ." [1]

On at least two occasions, appellant had formally asked the court to appoint a guardian *ad litem* for Melissa, and periodically bemoaned the fact that this had not been done. On January 3, 1978, the court appointed "counsel" for Melissa, but that appointment was rescinded shortly thereafter. Instead, on January 25, 1978, *appellant* was appointed as guardian *ad litem,* and her attorney was appointed as counsel for her, as such guardian. In this new capacity, appellant promptly filed a 17-page motion seeking summary judgment that the two deeds of trust were null and void.[2] While pursuing all of these requests for affirmative relief, including, as noted, the filing of extensive interrogatories, she resisted any effort on the part of the defendants to engage in their own discovery, in particular refusing to answer interrogatories served upon her. Her defense seemed to be that she was not a "party" upon whom interrogatories could be served. When the court ruled that she would have to answer the interrogatories, her counsel sent a letter to the court (with a copy to the Commission on Judicial Disabilities but not to other counsel) "formally resign[ing] as a natural and non-statutory individual party, specifically retaining all statutory positions to which she has been appointed or approved by Court Order."

Finally, after denial of several last-minute motions by appellant, trial was set for May 22, 1978. This proceeding commenced with appellant taking the stand and testifying that her mother was *mentally* incompetent — so detached from reality as to be unable even to receive notice of the trial. She offered letters from two physicians supporting that assertion. Her counsel, Jerome Piven, then advised the court

---

1. A number of documents that were produced in court that day in response to appellant's subpoena duces tecum were marked for identification as petitioner's exhibits but were not formally admitted into evidence, despite counsel's request that they be so admitted.

2. The grounds for this motion were essentially those asserted in appellant's earlier motion for summary judgment, which had been denied by the court, the basic difference being that this second motion was filed by her as guardian *ad litem.*

and the assembled parties and their counsel: (1) of his great astonishment to learn that the office or position of guardian *ad litem* — that for which he had persistently pressed and ultimately obtained for his client — had been abolished years earlier, and thus no longer existed in Maryland,[3] and that (2) his client, as a statutory interested person, was not a party, nor a representative of a party, and thus had no status in the case. Upon this basis, after three years of pleadings and hearings, all stemming from the petitions filed by him on behalf of appellant, he simply asked to be "excused from this case" — "... I don't belong here. I have no power to act as an attorney here today.... I'm asking to be excused from this courtroom because I have no status...."

Upon questioning by the court, Piven, in effect, said: Here are all these pleadings and exhibits; you, court, take care of the matter henceforth; I'm out of the case. He specifically declined to offer any further evidence in support of appellant's allegations — no testimony, not the exhibits which had previously been marked and identified, not his "Statement of Facts" or the exhibits appended to it. In short, he left the court with no formal evidence (except perhaps the documents admitted into evidence at the November, 1976, hearing on exceptions to the auditor's report) to support his client's charges — only some 1,600 pages of pleadings "for whatever use the Court wishes to make of [them]". At that point and upon that premise, the court granted the motions made by all of the defendants that appellant's amended petition be dismissed with prejudice. It did, however, order that "all records from the beginning of this estate [be] turned over to the Court auditor so that there will be a full and complete audit of this estate...."

Appellant, represented by different counsel, now asks this Court to strike the orders of dismissal and to remand the case to the circuit court "with appropriate instructions as to procedure in the premises." She claims that the court erred

---

3. *See* comment to Maryland Rule 205 e. There has been no provision for a guardian *ad litem* for at least nine years. Some of the confusion in this case might have been avoided if counsel and the court had kept even moderately current on the Maryland Rules of Procedure.

in refusing to stay the proceedings until appointment of a substitute guardian, and in requiring appellant to proceed with the "presentment of evidence". Both of these complaints relate, on the one hand, to appellant's responsibility to proceed with some evidence to substantiate her charges, and, on the other hand, to the court's overall responsibility to its ward, Melissa Rowe.

Appellant's position seems to be that, as a mere "interested person", she was entitled to bring matters pertaining to the guardianship estate to the attention of the court, but had no responsibility (or standing) to proceed any further. Having made all these charges, it was then up to the court to investigate them, obtain and evaluate the evidence, and grant the relief requested by her. Such is patently *not* the law.

As an heir of Melissa, appellant was, and is, an "interested person" in terms of the guardianship. Estates and Trusts article (hereafter "E.T.") § 13-101 (i). As such, she "may invoke the jurisdiction of the court at any time to resolve questions concerning the estate or its administration." E.T. § 13-203 (d). She is authorized, specifically, to file a petition for an accounting, to remove the guardian, and for the granting of "other relief" (E.T., § 13-210 (a)), which is precisely what she did.

The law provides that upon such a petition, "[u]pon hearing after notice *and upon good cause shown,* the court may issue an appropriate order." (Emphasis supplied.) E.T. § 13-210 (c). The critical word here is "shown" — the court may act when good cause has been *shown,* when the cause has been *proved, demonstrated.* This is done by the presentation of evidence. A court may not, under § 13-210 (c), pass substantive and final orders supported only by bald allegations, or by documents or assertions that are not in evidence. When presented with a petition such as was filed here, its obligation is to conduct a hearing so that the complaining party can produce evidence in support of his complaint and so that the parties complained about can have an opportunity to defend themselves. This is what due process is all about. This is what the statute requires. Under the circumstances that pertained here, and faced with Mr. Piven's sudden and obviously

unanticipated exodus from the case, the court was not wrong in dismissing appellant's amended petition. It could not have granted the relief prayed absent some further evidence to establish the alleged wrongdoing; and there seemed to be no one willing to proceed with that evidence.

It *was* wrong, however, in dismissing the amended petition *with prejudice,* because that might serve to preclude any further inquiry into the allegations made in it. A guardianship is not an ordinary type of lawsuit in which the court's role is merely that of fact-finder and adjudicator. It has a much deeper involvement — a much more significant function — in a guardianship proceeding. As stated by the Court of Appeals in *Kicherer v. Kicherer* (Sept. Term, 1978, No. 109, Opinion filed May 4, 1979):

> "Lest sight be lost of the fact, we remind all concerned that a court of equity assumes jurisdiction in guardianship matters to protect those who, because of illness or other disability, are unable to care for themselves. In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility."

*See also* 39 Am. Jur. 2d *Guardian and Ward,* § 1.

Quite apart from any allegations by appellant, the court's own file in this case reflected the fact that the guardian had never, over the three-year period of his guardianship, rendered a proper account of his actions, as required by Maryland Rule V74 and E.T. § 13-209. Especially when coupled with the charges made by appellant, that fact alone should have spurred the court, on its own motion, to inquire into both the affairs of the guardianship and Mr. Rowe's fitness to continue as guardian. Moreover, with respect to one of the challenged deeds of trust, the court had before it documents, apparently valid on their face, indicating that:

(1) the mortgage was executed in May, 1974 — five months *after* creation of the guardianship;

(2) it was not executed by Marvin Rowe as guardian who (in that capacity) was vested with title to Melissa's property

and was the only person who validly could execute such a deed of trust at that time (E.T. § 13-206);

(3) it was executed instead by Melissa herself, who had no power to do it, and by Marvin Rowe and his wife, individually;

(4) the interest rate on the mortgage was 12% (plus five "points") which, unless the transaction were in some way exempt from the State usury law in effect at the time, would have made the loan a usurious one; and

(5) the lawyers who represented Melissa in her affairs prior to the guardianship, and who continued to represent the guardian with respect to guardianship matters, also represented the mortgagee, John Hanson Savings & Loan, Inc., and acted as settlement attorneys; indeed, one such lawyer was shown as a director and member of the Executive Committee of the Association and actually voted to make the loan. He also served as a trustee for the Association under the deed of trust.

The validity of this deed of trust, and the underlying note for $55,000 was obviously of critical importance to the guardianship estate, and to Melissa herself. If not valid, payments made on it might have constituted a waste of guardianship assets, especially in light of appellant's further allegations that the proceeds of the loan had been misappropriated.

We shall not describe the other allegations made by appellant in any greater detail. Suffice it to say that these charges alone, coupled with the documents in the court's own file, and of which it was made aware, required an answer — not merely a pleading, but an explanation on the record. The court is not expected, as the judge suggested, to descend from the bench and act as a prosecutor; but neither may it forever foreclose an inquiry into these matters by dismissing the petition *with prejudice.* Charges of wrongdoing on the part of a guardian, or adversely affecting the guardianship estate, are, and must remain, viable until withdrawn or resolved on their merits. Perhaps the audit ordered by the court can serve as the vehicle for determining the validity of such charges as were made in this case. Perhaps some collateral proceeding

may be the vehicle to resolve some of these issues.[4] If neither suffices to permit the court to carry out its supervisory responsibility, it will have to act upon its own motion in some other way, *and promptly*!

As an editorial comment, we observe that this is the type of case that necessarily brings discredit upon the whole legal and judicial community. It may turn out that the charges made by appellant are absolutely groundless.[5] But it should not take nearly four years to find out.

> *Orders and final decrees vacated; case remanded to Circuit Court for Anne Arundel County (1) to enter orders dismissing amended petition without prejudice and (2) for further proceedings as may be required in conformance with this opinion; costs to be paid half by appellant, half by appellees. Mandate to issue forthwith.*

---

4. We were advised at oral argument that the mortgagee has attempted to foreclose on the disputed deeds of trust, and that their validity has been brought into issue in the foreclosure proceeding. As a result, and in light of our conclusion that appellant's amended petition should be dismissed, it is not necessary for us to reach the issue of whether appellant would have standing to challenge the validity of the mortgages in the guardianship proceeding.

5. A swift resolution of these complaints is in everyone's interest. At oral argument, counsel for appellees lamented the fact that they never had the opportunity to present their defense to appellant's charges.