[No. 32354. Department Two. August 31, 1953.]

HILDA E. HORTON, *Respondent*, v. ODENA LOTHSCHUTZ, *Individually and as Administratrix, et al., Appellants.*[1]

*Elliott & Schneider* and *Emerson B. Thatcher,* for appellants.

*Kelleher & Curran,* for respondent.

FINLEY, J.—Plaintiff Hilda Horton received a favorable decision in the trial court in her lawsuit seeking to establish her claim to an interest in certain real estate and to have the court effect a partitioning. The defendants have appealed.

The principal questions presented are: (1) whether the respondent should be estopped from establishing an interest in the land because of her failure to take timely action; and (2) whether the appellants established ownership in the land by reason of adverse possession.

[1] Reported in 260 P. (2d) 777.

Edward and Laura Lothschutz, now deceased, were the parents of plaintiff, Hilda Horton, and of the defendant August Lothschutz (who died shortly before the trial of this case). Robert Lothschutz, a third child of Edward and Laura Lothschutz, died without issue in 1941. In 1929, Edward and Laura Lothschutz and their son, August, purchased lots seventeen and eighteen of block two in the South Auburn Garden Tract, located in King county. Together, these three parties executed a mortgage on the property and with the proceeds erected a house thereon.

Both Edward and August Lothschutz worked for the Northern Pacific railroad. In 1937, Edward Lothschtuz retired from work on a pension of $27.79 per month from the railroad company. Around that time, the parents and their son, August, agreed, *inter sese,* that the monthly pension would be applied to the mortgage payments, and that the son, August, would care for and pay the living expenses of his parents. (Payment of the difference between the amount of the pension and the monthly mortgage installment of thirty dollars was arranged for in some unexplained manner by the parties.) During this period, August Lothschutz was unmarried. He paid his parents' expenses for some three years and until the occurrence of certain crucial events during 1940.

In the spring of 1940, Edward Lothschutz, then about seventy years of age, started on a trip to the state of Michigan. Apparently, he was seized with a fit of insanity while en route. He ran into difficulties in Montana, was placed in jail, and August (at his own expense) went there and fetched him back. Thereafter, Edward Lothschutz was subjected to recurring outbursts of violence and irrational conduct. There is conflicting evidence as to whether he was able to recognize his family, but there is sufficient in the record to suggest, without serious question, that he was insane.

On June 19, 1940, August Lothschutz executed a petition, filed in the King county superior court, alleging that his father, Edward, was insane, and asking for his commitment.

On that same day, Edward Lothschutz executed two deeds. By the first of these deeds, the validity of which is questioned in this action, Edward and Laura Lothschutz purportedly quitclaimed to August Lothschutz their interest in lots seventeen and eighteen, together with the house thereon, reserving a life estate in the property to Laura Lothschutz. By the second deed, Edward Lothschutz quitclaimed to Laura Lothschutz all of his interest in lots fourteen, fifteen, and sixteen, block two, South Auburn Garden Tract, which lots he and Laura had acquired separately. The evidence is conflicting as to whether Hilda Horton was present when these deeds were executed; however, there is little doubt but that she knew of their existence.

On the next day, June 20th, Edward Lothschutz was adjudicated insane and was committed to the Northern State Mental Hospital, where he remained until his death in 1943. Pursuant to the prior arrangement between the parties, August continued to support his mother until her death on October 9, 1940.

In April of 1941, August married the defendant Odena. They commenced living in the residence, and the plaintiff, Hilda Horton, who lived only a few blocks from them on the same street, was fully aware of their occupancy of the residence. Both before and after his marriage, August made payments on the mortgage which he and his parents had executed. He eventually paid off $946.26 on the principal and $317.97 in interest. At the time of the quitclaim deed executed on June 19th, referred to above, Laura and Edward Lothschutz's equity in the property was $450, and August had an equity therein of the same amount. It is quite significant that the real property here involved was not listed as an asset of Edward in the commitment and guardianship proceedings; furthermore, the estates of Laura and Edward were not probated. The $27 monthly pension Edward received from the Northern Pacific railroad appears to be the only property listed as an asset in the guardianship proceedings.

After their marriage, August and Odena Lothschutz made extensive improvements on the property, with the full knowledge of Hilda Horton, the plaintiff. While the actual dates on which these improvements began are in dispute (the trial court found they were commenced about 1946 or 1947), there can be no quarrel concerning their extent. Over the years, plumbing, heating, and laundry facilities were added to the premises, and changes in the house itself were made. Odena and August also built a garage and a chicken coop on the property. In addition to payment of the principal and interest on the mortgage, August also paid all taxes thereon, and at no time did the plaintiff make any offer to pay a prorated share of the expenses and improvements. It appears that August and Odena spent about $2,664 between the years 1940 and 1945, and that thereafter their disbursements were over $6,000 for expenses and improvements regarding the property.

As mentioned heretofore, Robert Lothschutz (the third child of Edward and Laura Lothschutz) died in June of 1941. The evidence discloses that Hilda Horton quitclaimed her interest in lots fourteen, fifteen, and sixteen to August Lothschutz in consideration for part payment of her share of the deceased brother's funeral expenses.

Until 1951, some eleven years after the father executed the deed conveying his interest in the real property to his son, August, Hilda Horton had never indicated in any manner that she questioned the validity of the deed covering lots seventeen and eighteen; nor had she asserted any claim or interest in that property. Apparently, plaintiff's first demand for an interest in the property occurred during the year 1951, at a period when August and Odena Lothschutz were separated and a divorce seemed imminent.

In 1951, Hilda Horton instituted this action to have her interest in the property declared, and requested partitioning by the court. By trial amendment, she also sought an accounting and a judgment for the amount of the rent allegedly owing to her by reason of her brother's occupancy of the property. Defendants cross-complained, alleging the

evidentiary facts heretofore recounted, and further alleging that the deed conveying the father's interest to August had been executed in 1940, with the full knowledge and acquiescence of plaintiff. The cross-complaint also alleged that the prior guardianship proceedings, in so far as they dealt with property rights, were *res judicata,* and that, under all of the circumstances, plaintiff was estopped from asserting any claim to the property.

The trial court made findings of fact and conclusions of law favorable to the plaintiff. Among the findings significant to this appeal, the court found that, when Edward Lothschutz executed the deed in 1940, he did not understand the nature and effect of his act; that no probate had ever been had of the parents' estates. A so-called finding was made that plaintiff was not estopped by her inaction to assert her rights in this proceeding (parenthetically, this seems to us to have been a conclusion of law); that appellants had made extensive improvements on the property, beginning in 1946 or 1947; that the value of the property on June 19, 1940, was $900, exclusive of the mortgage then on the premises; that by 1943, it had increased to $1,200 in value, and that since 1943, because real-estate values had tripled, the value of the property has been $3,600, plus the added value by reason of repairs and improvements, or a total value of $8,000 or $9,000; that the reasonable rental value of the premises was $15 per month from October 9, 1940 (date of the mother's death), until October 9, 1945, and thereafter, the reasonable monthly rental value was $25.

From these fact findings, the court made its conclusions, recognizing the plaintiff's interest in the property and establishing it as an undivided one-fourth interest, exclusive of improvements—or a one-fourth interest in the $3,600 value to which the court found the property had increased by virtue of higher real-estate values. Judgment was entered for plaintiff, giving her $900 for her one-fourth interest in the property and the sum of $558 as her share of the rentals which would have accrued had the property been rented.

The court denied defendants' motion for a new trial, and this appeal followed.

We shall first consider the appellants' affirmative defense, made in the trial court and urged on appeal, to the effect that, under the circumstances, since respondent at all times treated the deed from her father to his son August as valid—and apparently made no claim to the property for more than ten years—she is now estopped from attacking that deed and asserting an interest in the property.

The deed of an insane person, made prior to an adjudication of insanity, is voidable but not void. 6 Thompson on Real Property (Perm. ed.) 69, § 2983 (2831). Of course, if the deed is executed after an adjudication of insanity, it is clearly void rather than only voidable. In the latter instance, the adjudication of insanity is conclusive evidence of incapacity. 6 Thompson on Real Property (Perm. ed.) 76, § 2987 (2835).

The evidence here establishes to our satisfaction the correctness of the trial court's finding to the effect that, at the time Edward Lothschutz executed the deed on June 19, 1940 (one day before being adjudicated insane), he did not understand the nature and consequences of his acts. However, this taken alone does not establish the validity of respondent's claim of an interest in the property. We must still consider whether, by her long-standing inaction and her acquiescence in the apparent validity of the deed, she is now estopped to make any claim. In this connection, we note that there is evidence in the record suggesting that, at all times prior to her initial demand in 1951 for an interest in the property, she treated the deed her father executed as valid and subsisting. In fact, with reference to the deed to lots fourteen, fifteen, and sixteen of the South Auburn Garden Tract, executed with her knowledge on the same day as the deed to lots seventeen and eighteen (the latter lots being in issue here), she claimed a right in the former lots by way of inheritance, and recognized that right until she quitclaimed her interest in these lots to her brother. For approximately eleven years, she made no claim to any in-

terest in lots seventeen and eighteen, even though she knew that her brother and his wife, Odena, were making extensive improvements and repairs to the property. And it must be remembered that respondent lived only three blocks away from the appellants, on the same street.

 In appropriate cases, it has been held that, although a deed may not in its inception have been sufficient to pass title because of incapacity on the part of the grantor, the long acquiescence of parties in interest therein estops them from asserting its invalidity. The rule is thus stated in 6 Thompson on Real Property (Perm. ed.) 90, § 2997 (2845):

"§ 2997 (2845). *Long acquiescence of parties in interest as preventing avoidance.*—The option of an insane person, upon restoration to sanity, to avoid his contract or deed, or the right of his guardian, *heirs,* or devisees to such option must be exercised within a reasonable time. *A deed will not be set aside, on the ground of the incompetency of the grantor, after a long acquiescence of the parties in interest.* It was so held where the deed was by a father to one of his sons in consideration of support, and the grantee faithfully furnished such support for many years during the father's lifetime. . . ." (Italics ours.)

The case referred to is *Adair v. Cook,* 9 Ky. L. R. 455, 5 S. W. 412 (1887). In many respects, the facts of that case are strikingly similar to those in the case at bar. There, the plaintiff, sister of the defendant, sought to have set aside a conveyance their incompetent father had made to the defendant brother, on the ground that the grantor lacked mental capacity to convey the land. The grant had been made in consideration of the defendant's agreement to provide support for the grantor's widow and the mentally incompetent brother of the parties. For several years before execution of the deed (as in the case at bar), the grantee had supported his parents. On appeal, it was held that the long-standing acquiescence of the parties in the deed for some fourteen years, and the faithful performance by the grantee of his collateral promises to care for his mother and his insane brother, required that the deed be permitted to stand.

Undoubtedly, the result in *Adair v. Cook, supra,* was based on considerations of equity and justice and the general legal principle involved in the refusal of courts to disturb arrangements of parties which have been agreeable to them for long periods of time. We also again note the proposition stated in § 2997 of 6 Thompson on Real Property, *supra, i.e.,* that the action to disaffirm a deed of an incompetent must be taken within a reasonable time.

█ Appellants' claim of title, based upon the theory of adverse possession, deserves mention. However, on this point we shall not elaborate further, as we are convinced, for the reasons outlined heretofore, that estoppel precludes recognition of respondent's claims in this lawsuit. We think the trial court erred on the estoppel aspect of the case; that a reversal and dismissal are indicated, and it is so ordered.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.