REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1563

September Term, 2013

JAMES B. NUTTER & CO.

v.

EDWINA E. BLACK ET AL.

Kehoe,
Berger,
Nazarian,

JJ.

Opinion by Kehoe, J.

Filed: September 30, 2015

This opinion is about the scope of legal protections afforded to individuals who are unable to handle their financial affairs in a responsible manner because of a physical or mental condition. We will use the terms "disabled," "under a disability," and "subject to guardianship proceedings" to refer to persons who have been adjudicated by a court to be unable to manage their property and for whom a guardian of the property has been appointed.[1] We will employ the descriptors "incompetent" and "non compos mentis" for individuals who may be unable to manage their property, but who are not subject to guardianship proceedings. As we will explain, the distinction between an incompetent person and a disabled person is critical to the outcome of this appeal.

James B. Nutter & Co. ("Nutter") appeals from a judgment of the Circuit Court for Baltimore County in favor of Edwina E. Black and David L. Moore, Esquire. Nutter describes itself as "one of the leading reverse mortgage lenders[2] in the [United States]."

---

[1]This terminology is consistent with Estates and Trusts (ET) Article § 13-101(e), which defines a "disabled person" as an adult who:
>(1)(i) Has been judged by a court to be unable to manage his property . . . ;
>and
>(ii) As a result of this inability requires a guardian of his property; or
>(2)(i) Has been judged by a court to be unable to provide for his daily
>needs sufficiently to protect his health or safety . . . ; and
>(ii) As a result of this inability requires a guardian of the person.

[2]Commercial Law Article § 12-1201(h) defines a "reverse mortgage loan" as:
>[A] nonrecourse loan that:
>(1) Is secured by the borrower's principal dwelling;
>(2) Provides the borrower with purchase money proceeds, a lump sum
>payment, periodic cash advances, a line of credit, or any combination of
>those payment plans based on the equity in or value of the borrower's
>principal dwelling; and
>(3) Requires no payment of principal or interest until the full loan becomes

<span style="text-align:right;display:block">(continued...)</span>

Ms. Black is a disabled person. Moore has been the court-appointed guardian of her property since 1994. In 2009, Nutter entered into a reverse mortgage loan with Ms. Black. This took place without Moore's knowledge or consent. When Moore learned of the transaction, he refused to ratify it.

Nutter filed suit seeking a judgment requiring Moore to ratify the transaction or, alternatively, granting various forms of restitutionary relief. The circuit court concluded that there was no legal or factual basis for any of Nutter's claims and entered judgment accordingly. Nutter presents five issues, which we have consolidated and reworded:

> I. Did the circuit court err when it held that the loan transaction was void, as opposed to voidable?
>
> II. Is Nutter entitled to the restitution of any part of the money it paid to Ms. Black?
>
> III. Is Nutter entitled to subrogate its interest to that of the previous lender?
>
> We will affirm the circuit court's judgment.

---

[2](...continued)
due and payable.

In *Bennett v. Donovan*, 703 F.3d 582, 584–85 (D.C. Cir. 2013), the Court described reverse mortgages:

> Unlike a traditional mortgage, in which the borrower receives a lump sum and steadily repays the balance over time, the borrower in a reverse mortgage receives periodic payments (or a lump sum) and need not repay the outstanding loan balance until certain triggering events occur (like the death of the borrower or the sale of the home).

**Background**

This case came to the circuit court on cross-motions for summary judgment. Both parties relied upon a joint stipulation of relevant facts, which we summarize and supplement as necessary.

A. Ms. Black's Disability

More than 25 years ago, Ms. Black sustained permanent and significant neurological injuries after she was deprived of oxygen during a surgical procedure. In 1989, the Circuit Court for Baltimore City determined that Ms. Black was disabled, and appointed guardians of her person and her property.[3] In 1994, the Circuit Court for

---

[3]ET §§ 13-201(c) and 13-705(b) provide for the appointment of guardians for the disabled. Section 13-201(c), which provides for the appointment of a guardian of the property, states:

(c) *Disabled persons*. – A guardian shall be appointed if the court determines that:
(1) The person is unable to manage his property and affairs effectively because of physical or mental disability, disease, habitual drunkenness, addiction to drugs, imprisonment, compulsory hospitalization, confinement, detention by a foreign power, or disappearance; and
(2) The person has or may be entitled to property or benefits which require proper management.

Section 13-705(b), providing for the appointment of a guardian of the person, states:

(b) *Grounds*. – A guardian of the person shall be appointed if the court determines from clear and convincing evidence that a person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person, including provisions for health care, food, clothing, or shelter, because of any mental disability, disease, habitual drunkenness, or addiction to drugs, and that no less restrictive form of

(continued...)

3

Baltimore City appointed Moore as the substitute guardian of Ms. Black's property.

In 1995, Moore, acting in his capacity as guardian of the property, purchased a home (the "Stuart Mills property") located in Baltimore County for Ms. Black's use. To pay for the purchase, Moore, again in his capacity as guardian, borrowed $119,200 and signed a deed of trust note and a purchase money deed of trust. The note was eventually acquired by Bank of America. The deed of conveyance and the deed of trust were recorded in the land records of Baltimore County.

The deed of conveyance identified the grantee as "Edwina E. Black" and stated in pertinent part:

> See Order in the Matter of Edwina Black for the appointment of a Guardian as filed in the Circuit Court for Baltimore City, Case No. 89200059/CE100323. Said Order having appointed David L. Moore, Attorney at Law, as Substitute Guardian.

The deed of trust was executed as follows: "Edwina E. Black by David L. Moore, Guardian of the Property of Edwina E. Black." In 2007, Ms. Black's guardianship action was transferred from the Circuit Court for Baltimore City to the Circuit Court for Baltimore County.

B. The Reverse Mortgage Transaction

In April 2009, Ms. Black, acting on her own and without the knowledge or consent of Moore, entered into a reverse mortgage transaction with Nutter regarding the Stuart

[3](...continued)
intervention is available which is consistent with the person's welfare and safety.

Mills property. Before closing, Nutter engaged a title agent to examine the title to the residence, and to perform the typical closing services. The joint stipulation states that "[Nutter] and the title agent that handled the closing failed to properly identify the guardianship action in the Court record." The stipulation does not address whether Nutter or the title agent realized that Ms. Black was a disabled person based upon the information contained in the deed and deed of trust.

Most of the documents that Ms. Black signed as part of the reverse mortgage transaction are not in the record. What is clear is that Ms. Black executed two deeds of trust[4] encumbering the Stuart Mills property to secure repayment of the loan. At closing, Nutter paid $154,317.13 as follows: $80,651.96 to Bank of America to satisfy the existing loan and to extinguish the existing deed of trust; $57,132.01 directly to Ms. Black; and $16,533.16 for settlement expenses. Moore knew nothing about any of this. Ms. Black deposited the proceeds into her personal account.[5]

Moore first became aware that something was amiss when he received a notice from Bank of America stating that its loan had been satisfied and its deed of trust released. He made inquiries and learned of the reverse mortgage transaction. Moore then

---

[4]Ms. Black signed a deed of trust to Nutter and a second deed of trust to the Secretary of Housing and Urban Development.

[5]The transcript of Moore's deposition was attached as an exhibit to the stipulation. Moore testified that he had established a bank account in Ms. Black's sole name in which he deposited $500 monthly for her personal use. Moore stated that this arrangement was "pursuant to the direction of the court[.]"

5

withdrew from Ms. Black's account $34,106, that is, what was left of the money that had been paid to Ms. Black at closing. Moore deposited this money into a separate guardianship account.

On July 17, 2009, Moore notified Nutter of Ms. Black's disability and requested that Nutter provide him with the documents relating to the transaction. Nutter complied with this request. Thereafter, Nutter, and its agents, attempted to contact Moore over a period of several months, but received no response.

Finally, in November 2009, Nutter sent Moore a letter asking him (1) to ratify the reverse mortgage transaction or (2) to disaffirm it and reimburse Nutter in the amount of $137,738.97, that is, the sum of the Bank of America pay-off and the money paid to Ms. Black at closing. Approximately eight months later, Moore, through counsel, took the position that the reverse mortgage transaction was void as a matter of law and that he was under no duty to return any portion of the loan proceeds.[6]

## C. The Circuit Court Litigation

Nutter initiated this action on June 17, 2011, when it filed a complaint for a declaratory judgment and related relief against Ms. Black and Moore. Nutter asserted that it had entered into the reverse mortgage transaction with Ms. Black "without actual knowledge that [she had been] declared disabled and that [Moore] had been appointed

---

[6]Although Moore placed what was left of the money paid to Ms. Black in a separate account, he has withdrawn funds from that account to pay for counsel fees and litigation expenses. As of January 1, 2011, the balance in the account was $25,792.

Guardian of the Property of Ms. Black." Nutter presented three theories of relief relevant to this appeal. First, Nutter sought a judgment ratifying the reverse mortgage agreement between Ms. Black and Nutter. Second, Nutter asserted that Ms. Black and Moore had been unjustly enriched in the amount of $137,783.97, that is, its disbursements at closing less settlement expenses, and requested a judgment against Ms. Black and Moore in that amount. Third, Nutter sought to subrogate its interests to those enjoyed by Bank of America under the prior lien.[7]

Moore and Ms. Black filed an answer which sought, as additional relief, a judgment that the reverse mortgage was void, a declaration of title to the property in favor of Moore, as guardian of Ms. Black's property, attorney's fees, and any other relief necessary.

After the completion of discovery, the parties filed cross-motions for summary judgment. After oral argument on the motions, the circuit court, in a thorough and well-considered memorandum opinion and order, denied Nutter's motion for summary judgment and granted Ms. Black and Moore's cross-motion.

In summary, the court concluded that the reverse mortgage transaction was void, rather than voidable, and that Nutter was on constructive notice of Ms. Black's disability. The court denied Nutter's claim for restitution because it was premised solely upon its contention that the reverse mortgage transaction was voidable.

---

[7]Nutter also asked the court to remove Moore as guardian. Nutter does not assert on appeal that the circuit court erred in denying this request.

As to Nutter's claim for subrogation, the court noted that subrogation in this context is available "when there is a debt or obligation owed by one person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitle him to reimbursement to prevent unjust enrichment[.]" The court explained that "[a] volunteer is a party who has paid the debt of another without any assignment or agreement and is not under legal obligation, or compulsion to do so for the preservation of his own rights[.]" The court reasoned that, because the reverse mortgage transaction was void, Nutter had no rights in the Stuart Mills property and "thus was not compelled to pay the mortgage in order to preserve any rights."

After the court's memorandum order and opinion was issued, both parties filed motions to alter or amend the judgment on essentially the same grounds, i.e., that both parties had requested declaratory relief but that the court had failed to issue a declaratory judgment. The court denied Nutter's motion but entered a supplemental order declaring null and void "the Second Deed of Trust (to Secure a Reverse Mortgage Loan) . . . in favor of the Secretary of Housing and Urban Development," as well as "the Deed of Trust in favor of [Nutter]."

**Analysis**

We review the circuit court's grant of summary judgment *de novo, Harford County v. Saks Fifth Ave. Distrib. Co.*, 399 Md. 73, 82 (2007), determining, first, whether there

exists a dispute as to any material fact and, second, whether the circuit court was legally correct in granting judgment in favor of the prevailing party. *Lombardi v. Montgomery County*, 108 Md. App. 695, 710 (1996).

## I. Void or Voidable?

The parties agree that Ms. Black did not have the legal capacity to enter into the reverse mortgage transaction, but they disagree as to the implications of her condition. Moore asserts that Ms. Black's lack of capacity rendered the reverse mortgage transaction void. If the contract is void, Nutter has no right to enforce the terms of the reverse mortgage transaction and Nutter's remedies, to the extent that it has any, lie in subrogation and restitution.

For its part, Nutter contends that the reverse mortgage transaction was voidable. Nutter argues that, when Moore learned of the reverse mortgage transaction, he could have rescinded the transaction but was required to do so within a reasonable time period. Moreover, Nutter asserts that if Moore had opted to rescind, he would have been required to pay Nutter $137,783.97, representing the pay-off amount of the Bank of America loan plus the money paid to Ms. Black at closing. Because none of this occurred, Nutter contends that Moore, through his inaction, constructively affirmed the reverse mortgage transaction and that the circuit court erred in failing to enter a declaratory judgment to that effect.

In considering the parties' contentions, we will first examine the concepts of void

9

and voidable contracts, focusing on two recent and representative decisions of the Court of Appeals that approach the question from somewhat different perspectives. These decisions instruct that, in considering whether a contract should be treated as void or voidable, the Court plays particular heed to the degree to which a judicial conclusion that a conveyance is void might affect the interests of good faith third parties. We will review Maryland's statutory provisions for the protection of disabled persons as well as a series of earlier decisions of the Court of Appeals on which Nutter relies. Finally, we will consider the rights of third parties and how those rights might be affected by a judgment that the deeds of trust in question are void.[8]

## A. The Distinction Between Void and Voidable Contracts

"A void contract is 'not a contract at all' . . . and all parties, present and future, would be equally allowed to avoid the contract." *Julian v. Buonassissi*, 414 Md. 641, 666 (2010) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. a (1981)). In contrast, a voidable contract is one in which one or both of the parties have the right to "avoid the relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.'" *Id*. at 666–67 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 7 (1981)). The distinction between a void and a voidable transaction is particularly important with regard to deeds and other instruments conveying interests in real property. As the *Julian* court noted:

---

[8]Our analysis is limited to whether an attempt by a disabled person to convey an interest in real property is voidable or void.

once a deed is considered void *ab initio* or of no legal effect, there are lasting consequences to everyone in the subsequent chain of title. As a result, we have been circumspect at common law in finding a deed void *ab initio* and have limited our rulings regarding voidness to circumstances that go to the face of the deed, *e.g.*, forgery.[9]

*Id*. at 668 (footnote omitted). In this context, the Court cited two of its earlier decisions that dealt with "grantors suffering from mental infirmities," *Riley v. Carter*, 76 Md. 581, 595–96 (1893), and *Evans v. Horan*, 52 Md. 602, 610–11 (1879). In both of those cases, the Court concluded that such deeds were voidable, but not void. (We will discuss *Riley* and *Carter*, as well as some related decisions, later in this opinion.) Maryland's appellate courts have not definitively addressed whether a conveyance by a disabled person is voidable or void.

## B. Maryland's Guardianship Statute

Maryland's first comprehensive statute for the protection of disabled persons was first enacted at Chapter 72 of the Laws of 1785. That statute replaced a patchwork quilt of common law remedies and granted Maryland's Chancellor the "full power and

---

[9]Maryland courts have recognized another class of void deeds, namely, those involving a "lack of delivery." *Scotch Bonnett Realty Corp. v. Matthews*, 417 Md. 570, 583 (2011). Failure of delivery can be actual, i.e., when a deed is not recorded and the grantor retains control over it after its execution and acknowledgment. *Fike v. Harshbarger*, 20 Md. App. 661, 665 (1974), *aff'd*, 273 Md. 586 (1975). An actual failure of delivery does not affect the title of a good faith third party because recordation passes title. *See* Real Property Article § 3-101. A failure of delivery can also be constructive, as when a deed purports to convey property to a non-existent entity. *See Zulver Realty Co. v. Snyder*, 191 Md. 374, 382 (1948). Such a defect would not affect good faith third parties because a title examination would disclose that the grantee was not incorporated when the deed was recorded.

authority in all cases to superintend, direct, and govern [incompetent persons'] affairs and concerns, both as to the care of their persons, and management of their estates[.]" *In re Estate of Rachel Colvin,* 3 Md. Ch. 278, 282 (1851). Maryland's guardianship statute has been modified on numerous occasions, and is now codified at Title 13 of the Estates and Trusts Article.[10]

We are primarily concerned with Subtitle 2, which pertains to the protection of the property of disabled persons. A circuit court may appoint a guardian of the property upon a finding that:

> (1) The person is unable to manage his property and affairs effectively because of physical or mental disability, disease, habitual drunkenness, addiction to drugs, imprisonment, compulsory hospitalization, confinement, detention by a foreign power, or disappearance; and
>
> (2) The person has or may be entitled to property or benefits which require proper management.

ET § 13-201(c).

Appointment and qualification of a guardian of the property "vests in him title to all property . . . of the protected person that is held at the time of appointment or acquired later." ET § 13-206(c)(1)[11]; *Buxton v. Buxton*, 363 Md. 634, 647 n.2 (2001) ("Under

_____

[10]A very useful discussion of the historical development of Maryland's guardianship statutes may be found in Joan L. O'Sullivan and Diane E. Hoffman, *The Guardianship Puzzle: Whatever Happened to Due Process?* 7 MD. J. CONTEMP. LEGAL ISSUES 11, 13–24 (1996). What is essentially Maryland's current guardianship statute was enacted as Chapter 768 of the Acts of 1977. *Id.* at 24.

[11]A guardian is qualified when he or she posts the bond required by the court. ET
(continued...)

12

current law, a guardian for the property of an incompetent person *does* hold title to the protected person's property." (emphasis in original)). The guardian is required to use those resources "as needed for the clothing, support, care, protection, welfare, and rehabilitation of the disabled person." ET § 13-214(b)(2). In so doing, the guardian must "give consideration to the support and care of the disabled person during the probable period of the estate and the needs of persons dependent upon the disabled person." *Id.*

Consistent with these statutory provisions, a disabled person lacks the capacity to enter into a contract. *Gillet v. Shaw*, 117 Md. 508, 512 (1912) ("According to the established law in this state . . . the contract of a person adjudged to be insane cannot be enforced against him."). Similarly, a disabled person is unable to convey an interest in real property. *Supreme Council of Royal Arcanum v. Nicholson*, 104 Md. 472, 479 (1906) (When adjudicated to be non compos mentis, an individual "is divested of his property[.]"); *Law v. John Hanson Sav. & Loan*, 42 Md. App. 505, 512–13 (1979) (After appointment, the guardian "was vested with title to [the disabled person's] property and was the only person who validly could execute . . . a deed of trust[.]" Moreover, the disabled person "had no power" to do so.).

Additionally, an order appointing a guardian of the property is constructive notice of the limitations upon the disabled person's ability to enter into legally-binding contracts. *Flach v. Gottschalk,* 88 Md. 368, 376 (1898) (A guardianship proceeding

---

[11](...continued)
§ 13-206(b).

"furnish[es] notice—actual in some instances, constructive in others, but in both a sufficient notice—of the lunacy, and this would preclude an averment that the party dealing with the lunatic was ignorant of the latter's mental incapacity."); *Seaboard Surety Co. v. Boney*, 135 Md. App. 99, 117 n.3 (2000) ("'[G]uardianship proceedings are treated as giving public notice of the ward's incapacity and establish his status with respect to transactions during guardianship even though the other party to a particular transaction may have no knowledge or reason to know of the guardianship[.]'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 13 cmt. a.)).[12]

---

[12]Nutter makes a notice argument which we can dispose of quickly. ET § 13-217(a) provides that:

> Letters of guardianship may be recorded in the land records of the county of residence of the minor or disabled person and of any other county where there is real estate in which the estate has an interest. The recordation has the same effect as notice as recording a conveyance from the minor or disabled person to the guardian.

Moore did not record letters of guardianship in the land records of Baltimore County. Nutter asserts that, because he failed to do so, it cannot be charged with constructive knowledge of the guardianship. This contention is unpersuasive for three reasons.

*First*, both the deed of conveyance to Ms. Black and the purchase money deed of trust disclosed that Ms. Black was a disabled person, so the land records indisputably provided notice. *Second*, that the guardianship action is pending in the circuit court of the county in which the property in question is located provides constructive notice. *See Flach,* 88 Md. at 376; *Boney*, 135 Md. App. at 117 n.3.

*Finally*, Nutter's proposed construction of § 13-217(a) is inconsistent with ET § 13-206(c)(1) which, as we have noted, provides that appointment and qualification "vests" the guardian with title to "all property . . . of the protected person[.]"

(continued...)

14

Finally, we recognize that guardianship proceedings implicate one of the most

fundamental values of our society. As the Court of Appeals explained:

> a court . . . assumes jurisdiction in guardianship matters to protect those
> who, because of illness or other disability, are unable to care for
> themselves. In reality the court is the guardian; an individual who is given
> that title is merely an agent or arm of that tribunal in carrying out its sacred
> responsibility.

*Kicherer v. Kicherer*, 285 Md. 114, 118 (1979).

### C. *Atkinson v. McCulloh* and Related Decisions

Nutter's contention that the deeds of trust are voidable, instead of void, is largely

based upon its interpretation of the Court's analysis in *Atkinson v. McCulloh*, 149 Md.

662 (1926). Nutter views this case as standing for the proposition that a deed by a

---

[12](...continued)

If, as Nutter claims, a guardianship adjudication does not affect the interests of third parties until a notice of appointment is filed in the land records, then the provisions of § 13-206 regarding when title vests in the guardian are, for most purposes, meaningless. We cannot accept such an interpretation. *See Ray v. State*, 410 Md. 384, 404 (2009) (Statutes should be construed so that "no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.") (internal quotation marks and citation omitted).

Having explained what § 13-217(a) does not mean, we turn, very briefly, to what it does mean. Section 13-217(a) provides that a guardian "may" file a notice of appointment in the land records. When used in a statute, "may" is "generally permissive rather than mandatory." *See, e.g.*, *Brodsky v. Brodsky*, 319 Md. 92, 98 (1990). In our view, the legislature's use of "may," in the context of the statutory scheme, indicates that § 13-217(a) was intended to provide an *optional* means by which guardians can clarify the chain of title. In cases in which the disabled person owns real property in several counties, such a filing, or something similar in either the land records or the court records, may be necessary to provide constructive notice in counties other than the one in which the guardianship action is pending.

disabled person is voidable. Nutter misreads the opinion.

*Atkinson* is the capstone of a relative handful of Maryland cases that dealt with

conveyances,[13] or in some cases contracts,[14] by incompetent individuals who had *not*

been adjudicated to be disabled at the time of execution of the document in question. In

these decisions, the Court, either by holding or in dicta, established that such transactions

were (1) voidable but not void; and (2) could not be attacked by, or on behalf of, the

incompetent person, unless the contractual terms were objectively unfair or the

counterparty knew of the incompetent party's mental state when the contract was

executed. *Flach*, 88 Md. at 372–74.[15]

In *Atkinson*, the Court was confronted with a case in which the counterparty

(McCulloh) was aware, or should have been aware, of the incompetent's (Atkinson's)

---

[13]*Riley v. Carter*, 76 Md. 581, 595–96 (1893); *Evans v. Horan*, 52 Md. 602, 610–11 (1879); *Key's Lessee v. Davis*, 1 Md. 32, 39 (1851). In *Julian*, the Court cited *Riley* and *Evans* as two decisions holding that deeds executed by "grantors suffering from mental infirmities" were voidable but not void. 414 Md. at 668 n.16.

[14]*Flach,* 88 Md. at 370, and *Chew v. Bank of Baltimore*, 14 Md. 299, 320 (1859).

[15]In *Flach*, after surveying Maryland and English decisions on the subject, the Court concluded:

> the effect [of those decisions] has been to . . . fix[] a liability upon the lunatic when there has been, at the time the contract was made, no judicial ascertainment of his lunacy and when the contract is fair and *bona fide*, unless the other party to the contract knew at the time it was entered into that the lunacy existed.

88 Md. at 374.

mental status. 149 Md. at 673. Three years after the deed in question was recorded, and

after McCulloh entered into a contract to convey the property to a third party, Atkinson's

heirs filed an action to set the deed aside. *Id.* at 665–66. After considering the Maryland

cases which we discussed in the previous paragraph, as well as out-of-state decisions and

scholarly authorities, the Court concluded as follows:

> it seems to us the sounder view, and one more nearly in accord with the
> decisions of this court, is that the contract of a lunatic, made with a sane
> person who had, or could by the exercise of reasonable prudence have had,
> knowledge of his disability, may be avoided at the option of the lunatic
> when of sound mind, or by his guardian, heirs, or devisees . . . provided
> they exercise that option within a reasonable time, and surrender whatever
> benefit they have received from the transaction.

*Id.* at 674.

In its brief, Nutter asserts that the *Atkinson* analysis "does not distinguish between

contracts made by individuals already declared incompetent by a court versus contracts

made with individuals not declared incompetent by a court. It simply refers to 'lunatics.'"

The problem with Nutter's argument is that it takes the above-quoted passage from

*Atkinson* out of context. Earlier in its analysis, the Court noted that "[i]n this state the

contract of a person who has not been adjudicated *non compos mentis* is not void but

voidable." *Id.* at 672. Moreover, there is nothing in the Court's opinion that suggests that

Atkinson had been adjudicated as an incompetent either before, or after, the relevant

conveyance. The same is true for the other decisions holding that deeds by incompetent

persons were voidable but not void. *See Riley*, 76 Md. at 591–92 (the court's summary of

the pertinent facts); *Evans*, 52 Md. at 605–06, 609 (same); *Key's Lessee*, 1 Md. at 37–38 (same); *see also Safe Deposit & Trust Co. v. Tait*, 54 F.2d 383, 385 (D. Md. 1931) ("[T]he Maryland cases very clearly hold that contracts and conveyances by persons non compos mentis, before adjudication and not under guardianship, are merely voidable, and not void." (citing *Atkinson, Flach*, *Riley,* and *Evans*)).

In this line of cases, only *Flach v. Gottschalk* addressed the significance of an adjudication of disability. Flach entered into a contract for the purchase of whiskey and, after having taken delivery, refused payment based on his assertion that he was incompetent at the time the contract was made. The issue before the Court of Appeals was whether Flach could repudiate the contract. *Id.* at 370. The Court began its analysis by noting that:

> Speaking generally, the contracts of a lunatic, who has not been found by an inquisition to be insane, do not belong to the class that are absolutely void, but fall within the group that is described as voidable. This is certainly the law in Maryland.

*Id.* (citations omitted).

After reviewing relevant Maryland and out-of-state authority, the Court commented:

> As the lunatic's contract at best is only voidable it would be unjust and inequitable to allow him to repudiate it if it had been made fairly and in good faith when the other party was ignorant of the disability, unless both parties upon a rescission of it can be restored to the situation they originally occupied.

\* \* \* \*

18

*The inconvenience which it is supposed may result from this doctrine can easily be averted by a formal inquisition of lunacy.* Such an inquisition would furnish notice—actual in some instances, constructive in others, but in both a sufficient notice—of the lunacy; and this would preclude an averment that the party dealing with the lunatic was ignorant of the latter's mental incapacity.

88 Md. at 375–76 (citations omitted; emphasis added).

In short, the *Atkinson* line of cases provides no support for Nutter's contention that the reverse mortgage transaction is voidable, as opposed to void.

### D. The Rights of Good Faith Third Parties

We fully recognize that Maryland courts "have been circumspect at common law in finding a deed void *ab initio* and have limited . . . rulings regarding voidness to circumstances that go to the face of the deed, *e.g.*, forgery." *Julian*, 414 Md. at 668 (footnote omitted). This circumspection arises out of a concern for the rights of innocent third parties because "once a deed is considered void *ab initio* or of no legal effect, there are lasting consequences to everyone in the subsequent chain of title." *Id.*

In considering whether the deed executed by Ms. Black should be treated as the effective equivalent of a forged deed, two recent decisions of the Court of Appeals are instructive. The first is *Julian* itself; the second is *Scotch Bonnett Realty Corp. v. Matthews*, 417 Md. 570 (2011). In *Julian*, the Court considered when a violation of a statute could render a deed void; in *Scotch Bonnet*, the issue was whether a forged signature that was part of a larger scheme of misrepresentation rendered a deed void.

*Julian* did not involve an allegation of forgery. Instead, Julian asserted that the

deed in question was void because she had signed it without having been given a notice

of a right of rescission that was required by the Protection of Homeowners in Foreclosure

Act ("PHIFA"), Real Property §§ 7-301–7-321. 414 Md. at 666. The Court noted that

various provisions of PHIFA explicitly provided that certain activities undertaken in

violation of the statute were void. *Id*. at 675. However, the Court found no indication in

the language of the statute that the legislature intended that a failure to provide the right

of rescission notice rendered a subsequent deed void. *Id.* at 674. The Court concluded:

> In the present situation, the Legislature has spoken clearly when a
> provision was to be voided for violation of PHIFA. With respect to the
> notice of rescission language, the Legislature failed to include a reference
> to "void[.]" . . . To declare a deed void because of lack of notice could and
> would radically alter the protection of all *bona fide* purchasers in a
> subsequent chain of title.

*Id.* at 677.

    *Scotch Bonnett* involved a deed that was obtained by a forgery but was not itself

forged. Johnson, a mere acquaintance of the sole director of Scotch Bonnett Realty

Corporation ("SBRC"), submitted corporate articles of amendment to the Maryland

Department of Assessments and Taxation that designated him as an "officer" of SBRC.

417 Md. at 573. The articles of amendment were purportedly signed by the corporation's

resident agent and attorney but the signature was forged. *Id*. at 572–73. Johnson then

sold a property owned by SBRC to an innocent third party. *Id*. at 574. Johnson signed his

own name to the deed purportedly as an officer of SBRC. *Id*. Litigation ensued and,

eventually, the following question was certified to the Court of Appeals by the United

States Bankruptcy Court for the District of Maryland:

> Does the use of a deed that is neither a forged document, nor signed with a forged signature, but which derives its transactional vitality from forged corporate articles of amendment, render a conveyance of land void *ab initio*, or, is good title transferred to *bona fide* purchasers for value without notice?

*Id*. at 572.

The Court concluded that such a deed was not void *ab initio* because, among other reasons, an affirmative answer:

> would inject uncertainty into the law of conveyancing, beyond that already existing under the present rule under which a forged deed is void *ab initio*. Such a rule would turn into a jury question whether fraud in the inducement voided a deed *ab initio* and destabilize the predictability of result for *bona fide* purchasers for value. Stability of the law is particularly desirable in the field of real property law. A property owner's title should not be at risk that a grantor in the chain of title decides that the act of granting has been induced by a written misrepresentation, even if the misrepresentation includes a forged signature.

*Id.* at 587–88.

Both *Julian* and *Scotch Bonnett* cited with approval this Court's opinion in

*Harding v. Ja Laur Corp.*, 20 Md. App. 209 (1974). In *Harding*, we noted that a "forger,

having no title can pass none to his vendee." *Id.* at 214–15. From this premise, we

concluded that:

> Consequently, there can be no *bona fide* holder of title under a forged deed. A forged deed, unlike one procured by fraud, deceit or trickery is void from its inception. The distinction between a deed obtained by fraud and one that has been forged is readily apparent. In a fraudulent deed an innocent purchaser is protected because the fraud practiced upon the signatory to such a deed is brought into play, at least in part, by some act or omission on

21

> the part of the person upon whom the fraud is perpetrated. . . . A forged deed, on the other hand, does not necessarily involve any action on the part of the person against whom the forgery is committed.

*Id.* at 215.

Returning to the case before us, no provision in Maryland's guardianship statute explicitly provides that a deed by a disabled person is void. However, ET § 13-206(c)(1) provides that upon appointment and qualification, a guardian is vested with "title to all property of . . . the protected person that is held at the time of appointment or acquired later[.]" Thus, a disabled person, like a forger, holds no legal title to property. Owning nothing, she can convey nothing. *Harding*, 20 Md. App. at 214–15.

Additionally—and to address the policy concern raised in *Julian* and *Scotch Bonnett*—concluding that a deed by an adjudicated disabled person is void poses no threat whatsoever to subsequent good faith purchasers. A good faith purchaser is one who "acquires property for valuable consideration, in good faith, and without notice of another's prior claim to the property." *Fishman v. Murphy*, 433 Md. 534, 546 (2013). All potential purchasers of real property are on constructive notice of properly indexed information in the land and court records of the county in which the property is located. *See Greenpoint Mortgage Funding v. Schlossberg*, 390 Md. 211, 228–30 (2005). Thus, a court order appointing a guardian of the property is constructive notice to the world that the disabled person is without authority to convey his or her property. *Flach*, 88 Md. at 374; *Boney*, 135 Md. App. at 117 n.3. To be sure, a would-be purchaser or lender may

22

choose to forego a title examination, or to hire a negligent examiner, or to decline to take the trouble to look at the information generated by the title search, but imprudence of this sort bears its own risks. There is no reason for us to treat a deed by an adjudicated disabled person any differently from any other readily-recognizable title flaw. For us to do so, "would invite a 'head in the sand' approach, or create an exception that would 'swallow the rule' and undermine the protective purpose of guardianships." *Boney*, 135 Md. App. at 117 n.3.

Even from the scanty facts in the record, it is easy to conclude that treating the reverse mortgage transaction as void furthers the purposes of Maryland's guardianship law. Before the transaction occurred, the guardianship estate had more than $200,000 in equity in the Stuart Mills property—an asset that could be used to meet Ms. Black's future needs. After the transaction, the guardianship estate's equity in the property was significantly reduced and, over time, would have been eliminated altogether. Moreover, any future increase in value of the Stuart Mills property would inure to Nutter's, and not to Ms. Black's, benefit. Were we to conclude that the transaction was voidable, Moore would be required either to (1) ratify the transaction, a decision which, over time, would deprive Ms. Black of all equity in the property; or (2) rescind the transaction and make Nutter whole, a process which would require the effort and expense of obtaining substitute financing, as well as scraping money together to reimburse Nutter for the money that Ms. Black had herself spent.

In our view, neither of these outcomes furthers the purposes of Maryland's guardianship law. The court assumed jurisdiction over Ms. Black's property in the first place to protect her because she is unable to care for herself. *Kicherer*, 285 Md. at 118. As the court's agent, Moore is obligated to "discharge his duties for the best interest of the . . . disabled person or his dependents." ET § 13-206(c)(1). Those duties cannot be responsibly discharged by allowing the value of a major asset of the guardianship estate to disappear or by spending scarce guardianship funds[16] to save Nutter from the consequences of a problem entirely of its own making.

Our conclusion is squarely in accord with the scholarly authorities,[17] as well as

---

[16]The record contains no information as to the value of the guardianship estate. However, Moore testified in his deposition that Ms. Black's annual income from all sources varied between $45,000 and $65,000, and that it was not unusual for her expenses to exceed her income.

[17] *See* RESTATEMENT (SECOND) OF CONTRACTS § 13 (1981) ("A person has no capacity to incur contractual duties if his property is under guardianship by reason of an adjudication of mental illness or defect."); 2 JOYCE PALOMAR, PATTON AND PALOMAR ON LAND TITLES § 336 (3d ed. 2003) ("If a mentally incompetent person has been placed under guardianship, the general rule is that any conveyance by her is void, not merely voidable. This is not only because of her incapacity, but because she does not have the legal control of her property."); 2 THOMPSON ON REAL PROPERTY § 12.05(c) (David A. Thomas, N. Gregory Smith, eds., 3d Thomas ed. 2014) ("An attempted conveyance by an incompetent person after . . . a committee has been appointed is usually void, either according to statute or by judicial decision."); 1 POWELL ON REAL PROPERTY § 6.04 (Michael Allan Wolf ed., 2014) (same); 5 HERBERT THORNDIKE TIFFANY, THE LAW OF REAL PROPERTY § 1370 (Basil Jones ed., 3d ed. 1939) (A conveyance by a grantor after an adjudication of incompetency "is ordinarily regarded as absolutely void."). *See also* THOMPSON ON REAL PROPERTY, *supra*, at § 12.05(c) n.183 (noting that only two states, Arkansas and Maine, treat such conveyances as voidable).

decisions by the courts of other states.[18]

For these reasons, we hold that the reverse mortgage transaction between Nutter and Ms. Black was void *ab initio*. Moore was not required to take affirmative steps to ratify or rescind the transaction. Nutter's remedies, to the extent that they exist, lie in subrogation and unjust enrichment, and we will turn to those topics.

---

[18] *See, e.g.*, *First Interstate Bank of Sheridan v. First Wyo. Bank, N.A. Sheridan*, 762 P.2d 379, 382 (Wyo. 1988) ("While a contract made by one under guardianship by reason of incompetency has been held to be void, a contract made prior to an adjudication of incapacity and appointment of a guardian, but while the person is under mental disability, is only voidable." (citations omitted))*; Horton v. Lothschutz*, 43 Wash.2d 132, 137 (1953) ("The deed of an insane person, made prior to an adjudication of insanity, is voidable but not void. Of course, if the deed is executed after an adjudication of insanity, it is clearly void rather than only voidable." (citation omitted)); *Tomlins v. Cranford*, 227 N.C. 323, 326 (1947) ("A deed executed by a person who has been adjudged to be insane, sans proof of restoration of sanity, is void."); *Moore v. Coleman*, 128 W. Va. 223, 227 (1945) ("After a person has been adjudged insane or to be a mental defective, and a committee has been appointed for him, a deed of conveyance made while the guardianship of such committee actively continues is void[.]"); *Hughes v. Jones,* 116 N.Y. 67, 72–73 (1889) ("All contracts of a lunatic, habitual drunkard or person of unsound mind, made after an inquisition and confirmation thereof, are absolutely void, until by permission of the court he is allowed to assume control of his property."); *Huntington Nat'l Bank v. Toland*, 71 Ohio App. 3d 576, 578 (Ohio Ct. App. 1991) (The rule in Ohio is that "once a guardian has been appointed for an incompetent, transfer of property thereafter is void and may be set aside.");*Cohen v. Crumpacker*, 586 S.W.2d 370, 374 (Mo. Ct. App. 1979) ("While a contract made by one under guardianship by reason of incompetency is void, a contract made prior to adjudication but while the person is under mental disability is only voidable."); *Gibson v. Westoby*, 115 Cal. App. 2d 273, 276 (Cal. Dist. Ct. App. 1953) ("An adjudication that a person is incompetent constitutes notice to all the world of the incapacity of such person to make a valid conveyance. . . . A conveyance by such a person is void, and not merely voidable.").

## II. Restitution – Unjust Enrichment

"A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Hill v. Cross Country Settlements*, 402 Md. 281, 295–96 (2007) (quoting 1 DAN B. DOBBS, DOBBS LAWS OF REMEDIES § 4.1 (2d ed. 1993)). A claim of unjust enrichment consists of three elements:

> 1. A benefit conferred upon the defendant by the plaintiff;
> 2. An appreciation or knowledge by the defendant of the benefit; and
> 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Id*. at 295 (quoting *County Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 95 n.7 (2000)).

Nutter contends that, if it is not entitled to ratification of the contract, it is entitled to restitutionary relief in the amount of $137,783.97, that is, the sum of payoff figure for the Bank of American loan and what was disbursed directly to Ms. Black at settlement. The circuit court denied this relief. Nutter contends that the circuit court erred in doing so because it:

> conflated the enforceability of the reverse mortgage loan with [Nutter's] entitlement to equitable relief in the form of restitution to prevent unjust enrichment. . . . Moreover, even assuming arguendo that the reverse mortgage transaction was void (versus voidable), the concept of providing equitable relief in cases involving void transactions is established under Maryland law.

Moore and Ms. Black suggest that this contention is not preserved for appellate review. We agree.

The thrust of Nutter's argument before the circuit court was that the transaction was voidable, and that Moore failed to act in a timely fashion to rescind the transaction. At the conclusion of this discussion, Nutter stated "[a]lternatively, [Nutter] would be entitled to judgment against Defendants for restitution in the amount of $137,783.97." In its opinion, the circuit court noted the following (emphasis added):

> [Nutter] argues that it is entitled to restitution because Defendant Moore failed to properly avoid the mortgage contract. In light of the court's finding that the contract is void, that argument is moot and *[Nutter] asserts no other grounds upon which restitution should be granted*.

The circuit court did not "conflate[] the enforceability of the reverse mortgage loan with [Nutter's] entitlement to equitable relief in the form of restitution to prevent unjust enrichment" because Nutter did not assert that it was entitled to restitution if the transaction was void.

On appeal, we generally consider only issues "raised in or decided by the trial court . . . ." Md. Rule 8-131(a). Before the circuit court, Nutter took the position that it was entitled to restitution because the transaction was voidable. On appeal, it argues that, even if the transaction was void, it is still entitled to restitution based on the theory of unjust enrichment. These contentions are by no means the same, and Nutter's appellate argument is not preserved for our review. *See Starr v. State*, 405 Md. 293, 298–99 (2008) ("[T]he trial court is not required to imagine all reasonable offshoots of the argument

27

actually presented.”); *Faith v. Keefer*, 127 Md. App. 706, 737–38 (1999) (“As these contentions [as to why the trial court erred in granting summary judgment] have been raised for the first time on appeal, they are not preserved for appellate review, and we decline to consider them.”).[19]

### III. Subrogation

As its final contention, Nutter asserts that the circuit court erred when it denied Nutter’s request to be subrogated to the lien of Bank of America against the Stuart Mills property. We do not agree.

> Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person’s rights against the defendant. Factually, the case arises because, for some justifiable reason, the subrogation plaintiff has paid a debt owned by the defendant. Having paid the defendant’s creditor, the plaintiff stands in the creditor’s shoes . . . and is entitled to exercise all the remedies which the creditor possessed against the defendant.

DOBBS, *supra*, at § 4.3(4) (footnotes and quotation marks omitted). The leading cases in Maryland with regard to the closely-related topics of subrogation and unjust enrichment are *Hill*, 402 Md. at 294–307, and *Fishman v. Murphy*, 433 Md. 534, 546–57 (2013).

*Hill* involved a series of miscommunications between the seller of a home, Hill, the closing agent for the buyer, Cross Country Settlements, LLC, and the holder of a note

---

[19]Looking past preservation, Nutter’s claim that it is entitled to restitution is unpersuasive because, as we explain in Part III of this opinion, Nutter is an “officious payor” and therefore is ineligible for the remedies of restitution and subrogation. Moreover, we can discern no reason why the guardianship estate should be required to expend its assets to rescue Nutter from a debacle entirely of its own making.

secured by a deed of trust encumbering Hill's property, Provident Bank. 402 Md. at

289–91. As a result, Cross Country conducted settlement on Hill's property under the

erroneous belief that the property was unencumbered. *Id.* at 291. "Hill receiv[ed] the

proceeds of the sale of the Property without deduction for any amount due on the . . .

Provident loan," and "Cross Country, as agent for Stewart Guaranty Company

("Stewart"), issued a title insurance policy to the Buyer." *Id*. After the settlement, Cross

Country received a letter from Provident seeking payment on the loan encumbering the

property. *Id.* Cross Country sought payment from Hill, but was ignored. *Id.* at 291–92.

Stewart, as the title insurer, ultimately paid the amount due after foreclosure proceedings

were initiated, and demanded reimbursement from Cross Country. *Id.* at 292. Cross

Country paid Stewart, and filed suit against Hill, seeking reimbursement under theories

of unjust enrichment and subrogation. *Id*. at 292–93. Although the Court was unable to

resolve the merits of the claim on the record before it, it did address Hill's contention that

she was not liable to Cross Country because it was acting as "a volunteer" when it paid

Provident. *Id.* at 301.

> The Court explained that:

> It is undisputed that once properly yoked with the label of "mere volunteer"
> or "officious payor," a plaintiff is prohibited from recovering under
> theories of unjust enrichment or subrogation. It less clear, however,
> precisely when a plaintiff's payment to a third party satisfying the liability
> of the defendant renders a plaintiff a volunteer and casts him or her "into
> legal outer darkness." DOBBS, *supra*, § 4.3. Palmer notes that "[w]hen one
> person, without request, knowingly pays the debt of another . . . restitution
> will normally be denied." GEORGE E. PALMER, THE LAW OF RESTITUTION §

29

10.2 (1978).

402 Md. at at 301–02.

In considering this question, the Court reached several relevant conclusions. First, the Court noted that, although different authorities use the terms "volunteer," "officious payor," and "intermeddler," the terms have "identical meanings." *Id.* at 303 n.13. Second, the Court concluded that, as a matter of public policy, the concept of "volunteer" should be the same for unjust enrichment and subrogation claims. *Id.* at 305 n.15. Finally, the Court noted that traditional definitions of "volunteer" and "officious payor," etc. provide only limited guidance in cases "where it is asserted that a 'plaintiff settled and paid a . . . claim asserted by a third party on which the defendant was solely liable.'" *Id.* at 303. The Court concluded:

> The factual novelty of the present case requires us to adopt a rule to guide future unjust enrichment and subrogation actions. We agree with the Restatement (First) of Restitution (1937) § 79,[20] that a plaintiff may recover for a payment or payments to a third party as long as the plaintiff was not officious in making such payment or payments. Although we shall not supply an exhaustive list of situations where a plaintiff would not be deemed officious, *generally a plaintiff is not officious when he or she acts under a legal compulsion or duty, acts under a legally cognizable moral*

---

[20]RESTATEMENT (FIRST) OF RESTITUTION § 79 (1937) provides the following:

A person who entered into a transaction as an obligor, or who was claimed by the creditor to be an obligor, upon an obligation which, as between such person and another, the other had a primary duty to discharge, and who has paid the creditor in discharge of the obligation at a time when it existed against the other, is entitled to indemnity from the other, although originally or at the time of payment, the payor was under no duty to make the payment, unless his payment was officious.

30

*duty, acts to protect his or her own property interests, acts at the request of the defendant, or acts pursuant to a reasonable or justifiable mistake as to any of the aforementioned categories.*[21]

402 Md. at 305 (emphasis added).

Applying this rule to the facts of the case before us, there is no contract to which Nutter can turn to demonstrate that it was acting pursuant to a legal duty, because, as we discussed above, the contract between Nutter and Ms. Black is void. Nutter does not assert that it was acting under any sense of moral duty, nor can it, because, from Nutter's standpoint, this was strictly a business transaction. Nutter was also not acting to protect any property interest—the contract was void and Nutter did not have any interest in the Stuart Mills property. Moreover, Nutter cannot claim to have acted at the request of Ms. Black because she is a disabled person and only Moore had the authority to make

---

[21]In a footnote appended to this passage, the Court stated:

Public policy also is best served by liberally permitting a plaintiff to be subrogated to the rights of a third-party creditor. In traditional insurance subrogation cases, a narrow definition of the volunteer rule serves to encourage insurers to defend their insured even where there is a dispute over liability or coverage, thus avoiding unnecessary delay in the settlement of claims. "[P]ayment is not voluntary if it is made with a reasonable or good faith belief in obligation or personal interest in making that payment." COUCH ON INSURANCE § 223:27 (3d ed. 2005). "If plaintiff pays defendant's debt under the mistaken apprehension that he was himself under a duty to do it . . . there is less reason to treat him as being officious, and the courts will usually grant restitution." [John W. Wade, *Restitution for Benefits Conferred Without Request*, 19 VAND. L. REV. 1183, 1201 (1996)].

*Id*. at 305 n.15.

business decisions on her behalf.

In its brief, Nutter does not contest any of this. Instead, it argues, although it uses different terms, that it was acting "pursuant to a reasonable or justifiable mistake" regarding Ms. Black's legal capacity. In this regard, it relies on *Fishman v. Murphy.*

In *Fishman*, Street either (1) prevailed upon his elderly and terminally ill mother, Dorothy Urban, to sign a deed conveying her residence to him by abusing a confidential relationship that existed between them or (2) forged her name to the deed. At the time of the conveyance, the property was subject to a mortgage to CitiFinancial. 433 Md. at 539. Ms. Urban passed away and her estate filed suit against Street, asserting that the deed to him was null and void, and asking the court to order Street to transfer the property to the estate. *Id*. at 541–42. While this action was pending, Street refinanced the property with 1st Chesapeake Home Mortgage, LLC, paying off the CitiFinancial loan, which had a balance of $59,086.72. *Id*. at 539. Thereafter, the circuit court imposed a constructive trust upon the property in favor of the estate without deciding the deed was void *ab initio*.[22] *Id*. at 542. While the action between the estate and Street was pending, but before the court entered judgment, 1st Chesapeake assigned the note and its rights under the deed of trust to Midfirst Bank. *Id*.

Street defaulted on the note and Midfirst filed a foreclosure action. *Id*. at 542–43. Ms. Urban's estate filed a motion to stay and dismiss the foreclosure action. *Id*. at 543.

---

[22]The deed would have been void if Ms. Urban's signature had been forged but voidable if her signature had been the result of undue influence.

The estate asserted that (1) the judgment imposing a constructive trust on the property created a presumption that the deed to Street was void; and (2) alternatively, that the doctrine of *lis pendens* operated to provide Midfirst with constructive notice of the estate's claim and thus it could not claim that it was a *bona fide* purchaser. *Id.* As to the first issue, the Court of Appeals held that "the bare creation of a constructive trust, without a concurrent declaration that the underlying deed is void, renders the subject deed merely voidable." *Id.* at 548. As to the second issue, the Court concluded that the litigation between the estate and Street provided at least constructive notice of the estate's claim and therefore Midfirst was not a *bona fide* purchaser. *Id.* at 551.

The Court of Appeals then turned to an alternative argument presented by Midfirst: that it was entitled to be subrogated to the CitiFinancial deed of trust. The Court concluded that subrogation was appropriate because:

> Petitioners' predecessors in the chain were not volunteers or intermeddlers because they expended money to retire the existing loan in order to protect their interests. [1st Chesapeake], believing (mistakenly) that Street held a valid deed to the Pasadena property, expended $59,086.72 to pay-off the existing loan placed by Urban. Midfirst, as assignee of the note underlying the Street deed of trust, acquired an interest in the Pasadena property and became a lien holder as to that property. . . . Although Petitioners had constructive notice of another's claim on the land, constructive notice alone does not defeat the application of equitable subrogation. As we stated in [*G.E. Capital v. Levensen*, 338 Md. 227, 243 (1995)], equitable subrogation applies in the "absence of actual knowledge on the part of the subrogation claimant concerning the intervening lien."

*Id*. at 556 (citation omitted).

Nutter likens itself to the lenders in *Fishman* and asserts (citations omitted):

33

[T]he Court of Appeals in *Fishman* concluded that the lenders in that case were not volunteers or intermeddlers simply "because they expended money to retire the existing loan in order to protect their interests."

That is exactly what [Nutter] did. Like any other mortgage lender, and just like the lender in *Fishman*, [Nutter] retired the existing loan in order to protect its interests as the intended first mortgage lien creditor. [Nutter] lacked actual knowledge of the fact that Ms. Black had been adjudged incompetent. In fact, one of the parties' stipulated facts was that "[Nutter] and the title agent that handled the closing failed to properly identify the guardianship action in the Court record." All of the cases make it clear that constructive knowledge on the part of a creditor does not bar it from equitable subrogation.

Nutter's reliance on *Fishman* is misplaced because the deed in question in *Fishman* was voidable but not void. In contrast, as we have explained, the reverse mortgage transaction was void. A voidable deed extends varying degrees of protection to grantees and good faith third parties. A void deed does neither. Moreover, Nutter's assertion that it was acting "[l]ike any other mortgage lender" rings singularly hollow. Because a disabled person lacks the capacity to enter into contracts and cannot encumber property, *Law*, 42 Md. App. at 512–13, no mortgage lender exercising even an iota of diligence and prudence would extend a loan to an adjudicated disabled person. Finally, Nutter's claim that we should afford some special significance to the fact that the parties had stipulated that it "failed to properly identify the guardianship action in the court record" ignores the fact that both the deed of conveyance to Ms. Black as well as the purchase money deed of trust unambiguously informed anyone who bothered to read them that she was under a disability and that Moore was the guardian of her property.

*Hill* and *Fishman* make clear that subrogation is a remedy that should be liberally applied to prevent unjust enrichment. However, these cases are equally clear that subrogation is not available to an officious payor.[23] Those who seek equitable relief must first demonstrate that they deserve it. As a paradigmatic example of an officious payor, Nutter has failed to do so.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**

---

[23]If Nutter were not an officious payor, that is, if Nutter fit into one of the categories described by the Court in *Hill*, 402 Md. at 305, or something analogous, subrogation might be appropriate. However, *Hill* and *Fishman* are clear that subrogation and restitution are remedies that are not available to officious payors.

Moreover, in an appropriate situation, other considerations might outweigh Nutter's status as an officious payor. One example might be if the proceeds of the refinancing were used to purchase necessaries for Ms. Black. *See, e.g., Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 692 (1997) ("The doctrine of necessaries has long been a feature of Maryland law. It is as much a mechanism to protect minors as it is one to protect those who provide them with necessary services and goods."); *Flach*, 88 Md. 368, 372 (1898) (The doctrine of necessaries is applicable to contracts made by incompetent persons.). Nutter does not suggest that the reverse mortgage transaction is subject to the doctrine of necessaries.